## SID SPEARS V. THE STATE.

### No. 1937.  Decided February 21, 1900.

**1.  Special Venire—Practice.**

Where some of the ordered special veniremen who had been smmoned, failed to appear, and at the instance of defendant attachments were issued for them, but before they were all brought in under the attachment talesmen were ordered, but before said talesmen were passed upon one of the original veniremen was brought in and defendant was required to pass upon him without regard to the list of talesmen, Held, there was no error.

**2.  Murder—Evidence—Bloody Clothing.**

On a trial for murder, where the State was permitted to introduce in evidence the bloody clothing worn by deceased at the time of the killing, Held, a bill of exceptions to such evidence upon the ground that it was irrelevant and immaterial, should show the circumstances under which the clothing was introduced, so that the court on appeal might determine the relevancy, such testimony being ofttimes admissible and relevant in connection with other testimony connected with the homicide.

**3.  Evidence—General Reputation of a Party—Bill of Exceptions.**

A bill of exceptions to the refusal of the court to permit proof as to the general reputation of a party should show what that reputation was, and should also have shown how that reputation was material to the issues in the case or any one of them.

**4.  Wife-Murder—Malice—Cruel Treatment.**

On the trial of a husband for the murder of his wife it is competent for the State to prove defendant's overbearing and cruel treatment of his wife extending over a number of years prior to the homicide. Such evidence was admissible to show that his malice was continuous. Following Hall v. State, 31 Texas Criminal Reports, 565.

**5. Charge of Court—Harmless Error.**

A paragraph of the court's charge which might be erroneous if considered by itself, becomes harmless where, in a subsequent portion of the charge, the error is fully cured.

**6. Murder—Charge—Deadly Weapon.**

On a trial for murder, where the court charged the jury in effect that if defendant slew deceased of his express malice aforethought, with a razor, and not in his self-defense, and the razor was a deadly weapon, to find him guilty of murder in the first degree, Held, the charge was correct and was not obnoxious to objection that it told the jury that a razor was a deadly weapon.

**7. Same—Express Malice—"Unruffled Mind."**

On a trial for murder, where the court in its definition of express malice told the jury "that express malice did not mean that the mind of the slayer must be absolutely unruffled," HENDERSON, Judge, is of opinion the charge is erroneous, since a homicide committed where the mind was disturbed or ruffled by passion would be upon implied and not upon express malice, and not murder in the first degree. DAVIDSON, Presiding Judge, and BROOKS, Judge, dissent, and hold that this rule, first announced in Gaines v. State, 53 Southwestern Reporter, 623, should be overruled.

**8. Charge—Exception to—Practice on Appeal.**

Under provision of the Act of the Twenty-fifth Legislature, page 17, the court on appeal can not revise the charge of the lower court unless an exception to the same was taken and is shown by a bill, or the same was made a ground in the motion for new trial, and in either event it must, to constitute reversible error, have been calculated to injure the rights of defendant.

**9. Same—Negligent Homicide.**

On a trial for murder, where defendant's own testimony suggested an accidental but not a negligent homicide, a charge of court on reasonable doubt in connection with negligent homicide can not be complained of.

**10. New Trial—Remarks of Judge.**

Pending a motion for new trial, the judge in an interview with a newspaper reporter mentioned the case as one showing how speedy trials could be had and offenders brought to justice. Held, such inappropriate remarks of the judge afford no ground for reversal, where no other merit appears in the motion for new trial.

**11. Murder in First Degree—Evidence Sufficient.**

See opinion for a very cogent though concise statement of evidence which the court holds amply sufficient to sustain a verdict and judgment of conviction for murder in the first degree, with punishment assessed at death.

**12. New Trial—Newly Discovered Evidence.**

A motion for new trial for newly discovered evidence must disclose sufficient diligence to discover the evidence, and the facts stated must be material and calculated to change the result upon another trial.

APPEAL from the District Court of Grayson. Tried below before Hon. DON A. BLISS.

Appeal from a conviction for murder in the first degree; penalty, death.

The indictment charged appellant with the murder of Emma Spears on the 6th day of July, 1899, by cutting her throat with a razor. Emma Spears was the wife of appellant.

The following summary of the most important facts proven upon the trial is taken from the brief for appellant:

Defendant's evidence as to what occurred at the time of the killing was that he and his wife had been separated, and that he had been to see her at least once every day, where she worked at Mrs. Cook's;

that on the evening before the killing he went as usual, and before he got there he could see her talking to a colored man who worked for Tom Richards, named Neil Duly; that when they saw him they separated and his wife ran off, and he did not see her that evening. The next morning he went to see her as usual, and on going into the kitchen where she was he said "Good morning," and she replied, "Good morning." That he then asked her what made her run off the evening before so that he could not see her, when he saw her talking to Neil Duly; that she got mad and picked up a stovehook and began striking at him, striking him on the hand and arm, and then he took out his razor, which he always carried, and thought he would bluff her and get her to stop fighting at him by showing her the razor; that instead of her being bluffed by it she ran and grabbed at him, and that after she got hold of him he did not know just what occurred, and the next he knew was that he saw blood on the floor and he believed that he had cut her with the razor, but did not know how severely; that he did not know at all where she was cut or how badly she was cut, or how she got cut, but seeing the blood on the floor he threw the razor on the floor and went out of the kitchen into the yard, his wife following him, but he did not turn to look around,—just heard her footsteps; that he went out and to the jail and gave himself up. That when she was striking him with the stovehook she struck him between the joints of the little finger and the finger next to it, and that it bled all the way down Crockett Street, and that he would wipe it off with his hand; that before he got to the jail it had stopped bleeding. Witness here exposed his arm, showing the bruised place about three-fourths of an inch long on his left arm, which he said had been inflicted by the deceased with the stovehook.

A. D. Shrewsbury, the sheriff, testified that in the afternoon of the day of the killing he saw defendant's hand, and there was a bruise between the knuckles of the little finger and the one next to it. It was about the size of a silver dime, but the skin was not broken and it was not bleeding.

Albert Fitch testified that he went to the place of killing a little after 6 o'clock in the morning. Emma Spears was lying on the grass about fifteen feet south of the south door of the kitchen. He went in the kitchen; saw a stovehook like the one exhibited in court; it was in two pieces, five or six feet apart; picked up the pieces and laid them on the table; also found a black-handled razor with blade broken. The broken stovehook was identified by Mrs. Cook as the stovehook belonging to her stove, and that it was not broken the day before.

Mrs. Cook testified that deceased, Emma Spears, was her cook; that at about 6 o'clock on the morning of the killing she heard Emma scream; she immediately went from her room through the dining room to the kitchen; as she got to the dining room door she saw defendant,

41st Crim. Rep.—34

Sid Spears, standing close to and facing deceased; he had his right arm raised, but did not notice what, if anything, he had in his hand. Emma Spears was facing him and they were about two feet apart. Emma Spears had both her hands raised and her body was rather inclined to the left, as though she was warding off blows. Did not see any blood on the floor.

Mrs. Cook also testified that two days before the killing she saw deceased and defendant talking together in the back yard; they were not quarreling, but seemed amicable and pleasant, and she did not notice anything unusual in their actions.

The State, before the placing of the defendant on the stand, had introduced in evidence, over the objections of defendant, the testimony of Luella Rogers, of defendant having, at his own home at Gainesville, Cooke County, Texas, in the year 1896, struck his wife and ordering a negro man named Ed Groner, who was present, to leave the house; and of Eliza Douglas, of threats made on the 24th day of August, 1898, at Gainesville, Texas; by Mahala Watson, of threats made at Gainesville, at a date she could not fix,—not even remember whether it was before her own child was born or after, and the child was six years old; by Louis Groner, of defendant striking his wife at Gainesville at a date that he could not fix; of Ellison Foreman, of threats made in 1897; and of Ella Cole, as to striking deceased at Gainesville six or seven years before.

Defendant and deceased separated at Gainesville, Texas, in August, 1898, and defendant went to Dallas. Some time after the last part of the Dallas fair defendant came to live at Sherman, and he and his wife lived together with the mother of defendant. Their relations were pleasant. Defendant, to keep peace with his wife's parents, bought and paid for groceries and sent them to his father-in-law's. Defendant, after the separation, agreed with the person from whom they had purchased their furniture for her to keep it, and if she failed to pay for it he would. He bought his wife silk dresses, and there was not a single word of a threat or abuse during all the time they resided in Sherman, from about November, 1898, to date of killing, July 6, 1899, and even during the separation, which was about eight days before the killing. He visited his wife where she worked at about the same time every morning as he did on morning of the killing.

*E. C. McLean* and *G. P. Brown,* for appellant, filed an able brief and motion for rehearing.

*Rob't A. John,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE. Appellant was convicted of murder in the first degree, and his punishment assessed at death, and he prosecutes this appeal.

Appellant, by a bill of exceptions, calls in question the action of the court in impaneling the jury. The bill shows that, out of a special venire of sixty men selected to serve as a special venire, about forty-five were served who had not been excused; that there were only twenty-three of said special veniremen present; that, after twenty-three names had been exhausted, the jury not having been completed, the sheriff was ordered to summon a number of talesmen, and to telegraph and telephone to the constables and deputy sheriffs in the precincts in which the absent veniremen resided, and get as many as he could by the next morning; that when court convened the next morning a list containing the names of twenty-three jurors was handed appellant. The bill shows defendant objected to passing on the list handed him, and requested that he be given a list of the veniremen and talesmen sufficient in number to obtain a jury from. The court overruled the objections, and required him to pass on the jurors. After this was exhausted, another list of talesmen was summoned, and a list of thirteen talesmen was handed him from which to select a jury; one of this number being excused. Appellant objected to passing on this list, claiming it was not sufficient from which to select a jury. The court overruled the objection and compelled defendant to select jurors from the list so made out. On exhausting said list, eleven jurors were impaneled. The State at this time had exhausted its challenges, and the defendant had two still remaining. Another list of talesmen was ordered, and the sheriff brought nine talesmen into court, and a list of these was handed appellant. At this time one of the jurors on the original special venire, to wit, H. Eldridge, came into court, and was tendered to appellant; and this juror, after having been examined as to his qualification, was tendered appellant. Appellant objected to passing on this juror, and demanded that his name be put with the other nine jurors on the list of talesmen, and all put in the box together, and the clerk draw therefrom the names, and make a list of said jurors as drawn from the box. He insisted, in this connection, that there were some jurors on the list of talesmen that he preferred to Eldridge, but they were so far down on the list that, with only two challenges left, he could not get to them; but if required to pass on Eldridge, in connection with the list of talesmen which he then had, he would be compelled to accept the juror Eldridge in preference to any whose name appeared on the list that, with the challenges he then had, he might reach. The court overruled appellant's objection, and compelled him to pass on the juror Eldridge. Appellant accepted the juror Eldridge under protest. The court explained this bill by stating that he offered to issue attachments for all the defaulting jurors on the original and special venire list before resorting to issuing process for talesmen, and defendant's counsel requested this be done. The court at once ordered attachments to issue for all of said venire so served, which order of the court the officers proceeded to comply with. The court then required appellant to

proceed with the members of the venire present, over his objections. When this was finished, a number of absent veniremen were brought into court. These were duly placed on the list, and exhausted. After this others of the venire were brought in, and their names placed on the list and exhausted, until all the veniremen that could be found in the county had been produced and passed on, save the juror Eldridge. The court then stated that, if defendant so desired, proceedings would be stopped until the last venireman was brought in. Defendant's counsel then stated that, without waiving their objections to the court requiring him to commence selecting the jury until all the veniremen were present, defendant was willing to proceed with the talesmen so far as the one juror was concerned. The talesmen were then proceeded with, and while this was being done juror Eldridge was brought into open court, and the court required defendant to pass on him before a new list of talesmen was submitted as set forth in this bill. In the shape in which the matter is presented in the explanation of the court, we see no error. As to the juror Eldridge, it was entirely competent for the court to require him to be passed on without regard to the list of talesmen summoned. He was one of the original venire, and appears to have been desired by appellant, inasmuch as he had an attachment issued to him. Code Crim. Proc., art. 677; Cahn v. State, 27 Texas Crim. App., 709; Hudson v. State, 28 Texas Crim. App., 323; Habel v. State, 28 Texas Crim. App., 588.

During the progress of the trial the State introduced in evidence the bloody clothes of deceased, Emma Spears, which were worn by her at the time she was killed. Appellant objected to this, on the ground that same was immaterial and irrelevant, and could not be put in the transcript. The bill does not show the circumstances under which said clothing was introduced. It frequently occurs that the clothing of a person killed is introduced in evidence on the trial of the person accused of the homicide. This is generally done in connection with the testimony of some witness, and for the purpose of illustrating some relevant fact in connection with the homicide. Bryant v. State, 18 Texas Crim. App., 107; Levy v. State, 28 Texas Crim. App., 203; Spencer v. State, 34 Texas Crim. Rep., 238; Bell v. State, 32 Texas Crim. Rep., 436. Appellant ought to have shown by his bill the circumstances under which said clothing was introduced, in order that we might determine whether or not said testimony was relevant. The burden in this respect was on him to show the irrelevancy of said bloody clothing.

Appellant complains the court refused to permit the witness Louis Groner to testify as to the general reputation of Ed Groner. What that reputation was which appellant expected to prove is not stated. The bill should have shown this, and should have also shown how his reputation became material. Besides this, the court in his explanation states he allowed the defense to prove any and everything they

could about the character and reputation of the associates of Emma Spears, including Ed Groner.

By appellant's bills of exceptions numbers 4 and 5, he excepts to the action of the court permitting the State to show by a number of witnesses the course of conduct of defendant towards deceased for a number of years, going back as far as 1896; that his course of conduct was overbearing and cruel, etc. Appellant objected to this testimony on the ground it was too remote in point of time. The court explains the bill by stating that the State's theory was that defendant had, by a continuous course of cruel treatment, driven his wife to seek refuge with her father and mother, and, after getting her to come back to him, again commenced the same course of cruel treatment, which resulted in her again leaving him, and he finally made up his mind to kill her, when he found she would no longer live with him; in other words, that the malice was continuous. In this action of the court there was no error. Appellant was charged in this case with the murder of his wife, Emma Spears, and the evidence of the witnesses referred to in the bill tended to show a course of cruel treatment towards her on his part going back for a period of five or six years. These witnesses testified to several instances of assaults made by appellant on his wife at various times, and also showed two separations between the parties. The evidence was clearly admissible under the rule laid down in Hall v. State, 31 Texas Criminal Reports, 565; Wharton, Criminal Evidence, ninth edition, section 51, and authorities there cited.

Appellant insists the court erred in the seventeenth paragraph of the charge, which we quote as follows: "You are instructed in this connection, however, that if a person himself is the aggressor, and commits an assault and battery on another, then the fact that such other person strikes the aggressor, and causes him to suffer pain or loss of blood, will not constitute adequate cause to produce passion in the aggressor that will reduce a subsequent killing of such other person from murder to manslaughter." While this charge may not be correct if taken by itself, and might be misleading, because it does not state the character of original assault on the part of the slayer which would deprive him of the defense of manslaughter, yet, taken in connection with charge number 19, which elaborates the proposition contained in the charge quoted, we do not think it was calculated to confuse the jury, because in the latter charge they are distinctly told that the assault on his part which would deprive him (defendant) of the defense of manslaughter must have been a deadly assault; that if the slayer was the aggressor, and the assault by him was not made with the intent of bringing on a conflict for the purpose of killing, and he was in turn assaulted by deceased in a violent manner and with a deadly weapon, such assault might be adequate cause to arouse passion which would reduce a subsequent killing from murder to manslaughter. There was a phase of the case to which this

charge was applicable, to wit, appellant testified that deceased assaulted him with a pothook (an iron instrument pertaining to a cook stove), and subsequent to the homicide he showed a bruise on his left hand and arm. Now, if, according to his testimony, he and deceased had an altercation, and she assaulted him first with the pothook, and inflicted pain or bloodshed on him by means of such assault, then his defense of manslaughter was complete. If, on the other hand, he made an assault on her in the first instance, not of a deadly character (which was suggested by some of the State's testimony), and she retaliated with a deadly weapon, and inflicted pain or bloodshed upon him, then his defense of manslaughter was left complete under the charge of the court. Beyond this, the testimony of the State tended to show very strongly that she made no assault on him at all, but that he in the first instance assaulted her with a deadly weapon, and under such state of case, of course, the charge of the court, which so fully submitted manslaughter, though it may not have been fully authorized by the testimony, was liberal so far as defendant was concerned.

The thirty-first paragraph of the court's charge was excepted to on the ground that the jury were instructed that, if they believed from the evidence that defendant cut the throat of deceased, Emma Spears, with a razor, and not in the defense of himself, he would be guilty of murder in the first degree; and also instructed that the razor was a deadly weapon, without leaving it to the jury to say whether said razor was a deadly weapon. We have examined the court's charge with reference to this, and would say that the court did not instruct the jury, as stated in the bill, that if defendant cut the throat of the deceased with a razor, and not in defense of himself, he would be guilty of murder in the first degree. The instruction was to the effect that, if appellant slew deceased of his express malice aforethought, with a razor, and not in defense of himself, and that said razor was a deadly weapon, to find him guilty of murder in the first degree. Nor did this charge tell the jury that the razor was a deadly weapon, but left that matter with them to determine, if it was at all material. These observations also dispose of the thirty-third paragraph of the court's charge.

Appellant, however, contends for the first time in this court that the charge defining "express malice" was erroneous, on the ground that the jury were told "that express malice did not mean that the mind of the slayer must be absolutely unruffled." Appellant cites us to Gaines v. State (Texas Criminal Appeals), 53 Southwestern Reporter, 623, as authority against this charge. Appellant insists that this question is raised in his motion for new trial; but in the motion there is only a general objection to charge number 31, and reference is made to the bill taken at the time, and said bill, as we have seen, only asserts the objection to the charge which we have before treated. It will be further observed in this connection that

charge number 31 does not contain the qualification objected to, to wit, that homicide upon express malice does not mean that the mind must be absolutely unruffled. However, said charge does refer to the definitions of "express malice" theretofore given in the charge. Looking back to the court's charges, we find several defining "express malice," and, among others, we find a charge defining such "express malice," containing the qualification objected to, to wit, that it does not mean that the mind must be absolutely unruffled. But the writer does not believe that the objection here urged was properly reserved in the court below. If it could be conceded that it was, then it occurs to me that the charge was improper. True, the decision in Hall v. State, 33 Texas Criminal Reports, 191, indorses such a charge,—in fact, a charge that goes much further than this in qualifying the condition of mind in which the intent to kill upon express malice may be formed. That case refers to Farrer v. State, 42 Texas, 265, and Duebbe v. State, 1 Texas Criminal Appeals, 159. But I do not believe an examination of these cases will support such a charge. From the time of Blackstone up to the present, "express malice" has been defined as where one with a sedate, deliberate mind and formed design doth kill another, which premeditated design is evidenced by external circumstances discovering that inward intention, such as lying in wait, etc. See 4 Bl. Comm., 199; 2 Bish. Crim. Law, 726, 727; 1 Whart. Crim. Law, sec. 303; Whart. Hom., sec. 35; McCoy v. State, 25 Texas, 33; Ake v. State, 30 Texas, 466; Primus v. State, 2 Texas Crim. App., 369. In my judgment, a calm and sedate mind is one thing, and a mind ruffled by passion is another. The intent to kill upon express malice must be formed and carried out in a sedate and deliberate mind, while the intent to kill upon implied malice may be formed and carried out in a mind somewhat disturbed or ruffled by passion. When we begin to interpolate upon the time-honored definition of "express malice," and attempt to qualify it, we establish a precedent fraught with danger, and I am not willing to indorse such a departure. However, as stated above, the exception was not reserved to the charge on this ground; and the Acts of the Twenty-fifth Legislature (page 17) require, before the action of the lower court can be revised, that an exception must be reserved either in bill or in motion for new trial, and that such error, when so reserved, must be calculated to injure the rights of defendant.

Appellant in his motion for new trial reserved an exception to the thirty-fourth paragraph of the charge, on the ground that it shifted the burden of proof from the State to defendant to prove beyond a reasonable doubt the facts on which he based his defense; that is, the court instructed the jury that, in order to find defendant guilty of negligent homicide, they must believe beyond a reasonable doubt the facts on which his defense of negligent homicide was based. We are inclined to doubt that there is any negligent homicide in this case. Defendant himself testified, in effect, that he upbraided his wife for

talking to Neal Duly; that she then got mad, and picked up a stove-hook, and began striking at him on the head and arm, and that he then pulled his razor, which he always carried, and thought he would bluff her, and get her to stop fighting at him, and grabbed her; that she got hold of him, and he did not know just what occurred, and the next he knew was that he saw blood on the floor, and he believed he had cut her with the razor, but did not know how severely. This account of the transaction might suggest accidental homicide, which the court gave, but hardly raised the issue of negligent homicide. An examination, however, of the court's charge shows the court gave a charge on reasonable doubt in connection with negligent homicide.

Appellant, by a lengthy bill of exceptions, questions the action of the court in being interviewed subsequent to the trial, and before the motion for new trial was acted on, by a reporter connected with the Sherman Register, a newspaper published in Grayson County, in which the judge expressed himself with regard to the speedy administration of justice; and, among other things, cited the case of Sid Spears as illustrating how, notwithstanding the number of technicalities in our criminal procedure, which afforded a prolific source of delay in the trial of criminal cases, yet, by the exercise of diligence on the part of courts, speedy trials could be had and offenders brought to justice. We do not deem it necessary to quote at length the bill of exceptions on this subject, but will content ourselves with the observation that we do not believe it affords a reason why this case should be reversed. The motion for new trial, without regard to the remarks of the judge, must depend on its own merits, and, unless the reasons assigned therein furnish a sufficient ground in themselves to cause a reversal of the case, we would feel unauthorized to turn aside, and say that, because of some remarks of the judge in regard to the case, pending the motion for new trial, which may not have been appropriate, this, in itself, would furnish a ground for reversal, although no merit was shown in the motion for new trial.

It is also contended by appellant in the argument that the evidence does not support the verdict of the jury; that is, that the jury was not authorized to find appellant guilty of murder in the first degree. We have examined the record carefully in this regard, and, in our opinion, the evidence supports the finding of the jury. According to the testimony, appellant had been guilty of a course of cruel treatment towards his wife extending back through several years. She had separated from him once, some years before the homicide, and some eight days before the homicide she separated from him the second time. Evidently enraged at her conduct, he prepared himself with a razor, went to his wife's apartments in the early morning, where he found her alone; laid violent hands on her, and cut her throat with a razor, inflicting a ghastly wound, which almost severed her head from her body. From the testimony we gather this was premeditated, and not a sudden act of killing. Appellant made no complaint when

arrested of any assault on him by his wife, and some hours after his arrest, and after he was in jail, he exhibited for the first time small bruises on his arm and hand, which on the trial he testified were made by his wife just before he killed her. The jury evidently believed the State's theory of the case, and disbelieved his version, and we can see no reason for disturbing their verdict.

We have also examined the motion for new trial as to the newly discovered evidence. Appellant shows by his own affidavit that he knew of the testimony of W. H. Douglass, but failed to recollect it. This would not constitute sufficient diligence as to this evidence. He states, however, that he did not know of the conversation between Overby and Douglass, concerning the facts set out in the affidavit of W. H. Douglass. As to these facts we do not believe, if they were admissible, that they were material, or would have served in anywise to change the result of this case. The judgment is accordingly affirmed.

*Affirmed.*

DAVIDSON, PRESIDING JUDGE.—As I understand the record, I concur in the result reached. I do not concur in that portion of the opinion which states that an exception was not reserved to the court's definition of "sedate and deliberate mind." The eighth ground of the motion is: "The court erred in the thirty-first paragraph of his charge, and said defendant excepted to this paragraph before the charge was read to the jury." The thirty-first paragraph of the charge instructs the jury, among other things, as follows: "If you believe defendant, Sid Spears, did, with express malice aforethought, with a sedate and deliberate mind, and formed design to kill, and as these expressions have been explained to you, did, with a razor, cut the throat of Emma Spears, not in the defense of himself, and thereby killed her," etc., "you will find him guilty of murder in the first degree." Now, the "sedate and deliberate mind" referred to in this paragraph is defined in the tenth paragraph as follows: "The expression 'sedate and deliberate mind' means simply that the mind is sufficiently composed to admit of reflection and consideration upon the design, and in a condition to comprehend the nature of the act designed and its probable consequences. It does not mean that the mind must be absolutely unruffled. It means that the killing must not result from a mere sudden, rash, and immediate design, springing from an inconsiderate impulse, passion, or excitement, however unjustified or unwarranted it may be." The particular point of this charge complained of was with reference to the "unruffled condition of the mind." And it was held in the Gaines case it was error for the court to give this charge. I do not believe in this respect the Gaines case is correct. The law has been otherwise in Texas (see Farrer's Case, 42 Texas, 271; and see also Hall v. State, 33 Texas Criminal Reports, 191, and Duebbe v. State, 1 Texas Criminal Appeals,

159), and, under my view, is unquestionably the law. But, if it be conceded that the question is not sufficiently raised by the motion for new trial, then I desire to say, in any event, that the charge is correct, and to leave the Gaines case in the condition it is, without correcting the error, would lead to unnecessary complications hereafter in the trial courts. The Gaines case on this question should be overruled, and the law made to harmonize with that line of decisions above cited, which has always been considered the law in this State.

BROOKS, JUDGE.—I concur with DAVIDSON, P. J., and believe the law as announced in the decision cited above is the correct doctrine.

[NOTE.—Appellant's motion for rehearing was overruled without a written opinion.—Reporter.]