JOE MELTON v. THE STATE.

No. 3032.   Decided December 17, 1904.

**1.—Murder—Evidence—Bloody Clothing.**

The introduction of the bloody clothing of deceased on a trial for murder, which did not serve to assist in the development of any matter connected with the trial, but was calculated to inflame the minds of the jury was error.

**2.—Same—Evidence—Declarations of Defendant.**

A conversation between defendant and the brother of deceased, Ben Ellington, to the effect that the defendant would kill any son of a bitch of Ellington there was who said that he charged a man for a drink of water, in which deceased's name was not mentioned and did not tend to connect deceased with the implied threat in any manner, was not admissible in evidence on trial of defendant for the murder of deceased.

### 3.—Same—Evidence—Reputation of Deceased—Insult to Female Relative.

Where the defense introduced evidence that the deceased had used insulting language in the presence of and to defendant's wife, the State could not be permitted to prove the reputation of deceased that he was courteous and urbane in the presence of and towards ladies, the reputation of 'deceased not having been put in issue. Overruling Martin v. State, 6 Texas Ct. Rep., 267; Everett v. State, 30 Texas Crim. App., 682. Brooks, Judge, dissenting.

### 4.—Same—Charge of Court—Reasonable Doubt—Burden of Proof.

A charge of the court that if the jury believed from the evidence beyond a reasonable doubt that defendant did unlawfully and voluntarily shoot and kill deceased with a pistol, and they further so believed that previous to such killing defendant had been informed by his wife that deceased had used insulting language to her and that defendant killed deceased at his first meeting with him after he had been informed of such insulting words, under the immediate influence of the passion arising in his mind from such information, etc., required the jury to believe beyond a reasonable doubt, that the insulting language was used in order to reduce the homicide to manslaughter, whereas the defendant should have had the benefit of that doubt; and was error in shifting the burden of proof. Overruling Spangler v. State, 42 Texas Crim. Rep., 233; Spears v. State, 56 S. W. Rep., 347, to the extent they conflict herewith.

### 5.—Same—Charge of Court—Manslaughter.

A charge of the court which required the jury to believe beyond a reasonable doubt that appellant's wife had informed him of insulting language used by deceased towards her, instead of instructing them that if defendant was informed of such language and in good faith acted upon such information, etc., the homicide would be reduced to manslaughter, was error.

### 6.—Same—Adequate Cause—Charge of Court—Provocation.

Where the adequate cause consisted of insulting language used by the deceased to the wife of appellant in his absence in the morning, prior to the homicide in the evening, it was error to charge the jury that the provocation must arise at the time of the commission of the offense, as the provocation arose before, and the charge should have submitted the issue of manslaughter upon the evidence disclosing adequate cause by reason of the insulting language by deceased towards appellant's wife, and the predicate for the passion need not arise at the time of the homicide.

### 7.—Same—Charge of Court—Right to Seek Deceased for Peaceable Solution.

Where the evidence showed that defendant sought deceased for an explanation and retraction of insulting language to the former's wife, with the view, if the retraction or explanation was made that friendly relations would be resumed between them, the jury should have been instructed that defendant had the right to seek deceased for a peaceable solution of their difference and ask a retraction of the insulting conduct of deceased, and that in doing so, he had the right to go armed to resist any anticipated attack from deceased.

Appeal from the District Court of Kaufman. Tried below before Hon. J. E. Dillard.

Appeal from a conviction of murder in the second degree; penalty, fifteen years imprisonment in the penitentiary.

The testimony of Dr. Joe Sanders showed that he went out in his pasture to catch his horse, and when about 160 yards from defendant's house, he saw him walk out of it across the big road to where deceased was plowing just on the inside of the fence, who was turning at the end of a cotton row, and was about thirty or thirty-five feet north of due east line from defendant's front door. Witness went on back to his house, went through the house and sat down on his front gallery and looked down where defendant and deceased were standing. Defendant was still standing on the outside of the fence and deceased just inside

of it. Witness saw defendant stoop down and disappear, and witness raised to see what was going to take place; just as defendant came up on the inside of the fence, witness saw smoke and heard the shot; the smoke looked like it went right in the face of deceased, Ben Ellington, who whirled to run, and Melton, the defendant, stood still and fired three more shots. Ellington ran in a stooping position in northeast direction about twelve or fifteen steps, and then turned north, going right up through the cotton patch. Melton stood still until Ellington turned north, and then started after him, running about half way between him and the fence and parallel with it. Ellington looked like he was running as fast as he could, was in a stooping position and going in the direction of witness' house. Melton was running or hopping along (he limped) half way between him and the fence and a little behind him. Ellington was hallooing, "Keep him off, keep him off." After running about 102 steps, Ellington stopped and looked back at Melton with his face to the south and seemed to be still in a stooped position. The first shot that was fired there, Ellington fell with his face eastward; Melton turned east, walking toward where Ellington fell, and was holding his pistol out and fired again, the smoke ranging downward; Melton walked clear around deceased, stuck his pistol down and fired again, making seven shots in all. When Melton and Ellington were talking at the cultivator, the latter was standing up with his face to the west with his left hand on the handle of his cultivator; witness could tell this from where he was in the pasture and when witness got out on his front gallery, it looked like deceased was standing in the same position, and he was still standing in this position when the first shot was fired. This place where deceased stood at his cultivator is about 300 yards from witness' house. After Melton had fired the last shot, he looked at Ellington for about a minute, and then walked back into the road, next to witness' fence, with his pistol in his hand and witness understood him to say, "Come on down here!" and then he went back to his house. The witness examined the wounds on deceased and found two wounds which would cause instant death, others would not have been fatal, and that deceased could not have run after receiving either of the two fatal shots. Ellington was dressed in a jumper, an undershirt and a pair of overalls. There were no arms about him, just had an old rusty knife and that was shut.

Other testimony was introduced by the State corroborating the main witness' statement of the homicide. Also that on the day before the killing the defendant and deceased had had a dispute; also threats of defendant against deceased.

The defendant's testimony as taken from the brief of his attorneys was as follows:—Appellant, Joe Melton, testified in substance: "Carrie Melton is my wife, have been married four years, she was 17 when we married, is 21 now. We have one child, which is six months old now. Last year I lived twelve miles southwest of Kaufman on the

Red Bank and Kaufman road, was acquainted with Ben Ellington; had known him six years. I owned a little place in that community, the road divided my field from the one he was living on, and his house is about 200 or 250 yards southeast of mine. * * * I think I got back home that day about 12 o'clock, did not notice the time; Ed Jackson and the two Chambers boys and an old negro were with me. My wife did not have dinner ready, I left the boys on the front gallery, and went in where my wife was in the dining room, she was crying. I asked her what was the matter. She told me that Ben Ellington had stopped in front of the house as he was plowing and asked where I was, and that she told him I was at work, and he said to her, 'You tell him he has got ten days to get out of the country,' and says, 'You old whore, you had better get out, too.' Then he asked her why she would get with pups by such a damn dog as me, and something else she could not understand. She said that she got up right straight and went in the room. I ate only three or four bites that day for dinner. I never had anything to affect me like that did, I did not go back to work that evening. I got up, went out in my field about 100 yards from the house and got some green corn for my mules, I made two trips. After that I came back to the house and tried to read, but could not. I could not do anything I wanted to. I tried to talk about it, but could not talk to do any good. I asked what I must do about it, she told me that she did not know, but for me to do just to suit myself, for she said I knew best. I did not see the deceased in the field at that time, but a little later. I did not go out as soon as I saw him, waited some bit before I went out to where he was; when I went out he was coming to the end of the rows, and just about the time I got there he began to turn around, it was not right exactly in front of my house, it was some little north, but a very few steps. I went out to see about the talk he had had with my wife. I spoke to him, 'Good evening,' and he said, 'Howdy' to me. I asked him what he had it in for me about, he said the first reason was about a horse that I had bought from his father. I told him I thought I had made satisfactory arrangements with his father about that. Another was that I had scandalized his sister. I told him I had never spoken a hard word about his sister, and that I had two five-dollar bills that I would give to him if he would show me any man in that country that said I had spoken a hard word in any way about her. He remarked that he did not have to go over the country straightening up matters for a damn rascal. I told him very well, and asked him if there was anything else; he said I had told Mr. Spears that he had never paid off the note he was owing to me. Another was that I had accused him of stealing three beef hides from me. I told him that I did not, that I never had any hides stolen from me. He said that he could prove it by Mr. Davis. After that I asked him about what he said to my wife, and he said, 'Damn you, I did, and mean it. Futhermore, if you say three more words to me, I will go to Dr. Sanders' and get his gun and shoot your brains out.'

I told him he had better not try it. I asked him to take back what he had said to my wife, and he said, 'You mother fucking son of a bitch, I will see you and her both in hell further than a pigeon can fly before I will take it back.' Then he started to reach for something to throw at me. I commenced to get through the fence; just as I got inside of the fence (where he was) he threw at me, and his hat fell off. About the time he threw I commenced to shoot, and then he turned and ran. Do not know exactly how many shots I fired then; was excited, but think two or three, probably four. He ran in a northeast direction some eighteen or twenty steps, then stopped, turned his face toward me and said, 'I am going to Dr. Sanders' and get his gun and will shoot your brains out.' He turned in the direction of Dr. Sanders' and I got between him and the fence. I do not know how long Ellington had been plowing that evening when I went out, did not see him when he left his house to go to work, I saw him after he went to work."

The wife of defendant testified as to the insulting language of deceased toward her, substantially as testified to by the defendant in his above statement, and that she informed him of it as soon as he reached home.

*Young & Adams,* for appellant.—On the proposition of reasonable doubt: White's Penal Code, art. 702, paragraph 4; Id., art. 703; Id., p. 430, sec. 1220; Rockhold v. State, 16 Texas Crim. App., 577; Pitts v. State, 16 S. W. Rep., 189; Jones v. State, 33 Texas Crim. Rep., 492. On question of provocation: Orman v. State, 22 Texas Crim. App., 617. On reputation of deceased: Moore v. State, 79 S. W. Rep., 565.

A threat made by the defendant is never admissible unless it can be shown that the threat was made against the deceased himself. The testimony shows that the name of deceased was not mentioned in said conversation; that it was not shown that the deceased had ever made the statement in controversy. Strange v. State, 42 S. W. Rep., 551; Godwin v. State, 43 S. W. Rep., 336; Holley v. State, 46 S. W. Rep., 39; Gaines v. State, 53 S. W. Rep., 623.

*Howard Martin,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—This conviction is for murder in the second degree, the punishment being fixed at fifteen years in the penitentiary.

The State introduced Mrs. Ellington (wife of deceased) as a witness, and had her to display before the jury the blood stained clothing worn by her husband at the time of the homicide. Various objections were urged to the introduction of the bloody clothing. Under the authority of Cole v. State, 8 Texas Ct. Rep., 141, this evidence should not have been introduced. It served no legitimate purpose; it did not aid in any way in solving any issue in the case. There was no question in

regard to the location of the wounds, their effect and character. It is permissible to introduce the bloody clothing, when their introduction serves to illustrate some point or solve some question or throw light upon some matter connected with the proper solution of the case, but under no other circumstances. The introduction of this evidence did not serve to assist in the development of any matter connected with the trial, and the testimony was to inflame the minds of the jury.

The State called John Ellington (brother of deceased) as a witness, and he testified that, about the 29th of June, 1903, in a store in Kaufman, he had a conversation with appellant. Appellant asked the witness if he had heard that he (defendant) had charged a man for a drink of water. An affirmative reply was received. Defendant then stated, "I will kill any son of a bitch of Ellington there is, who says that I charged a man for a drink of water." During the conversation the name of deceased was not mentioned. Various objections are urged to this, among others, that the alleged threat or conditional threat was not directed against deceased; it had no connection with him; his name was not mentioned, and especially so as the killing occurred about other and entirely different matters; and that the testimony was prejudicial, etc. We are of opinion the objection should have been sustained. If this conversation tended to connect deceased with the threat or implied threat in any manner, it would have been admissible, but it did not, and so far as the bill shows, only tended to connect John Ellington with it. Nor is there any statement in the record disclosing that deceased ever had any connection with the matter or had made any remarks about the matter which was the subject of the conversation. Only John Ellington and wife were mentioned in the conversation referred to in the bill.

One of the issues raised by the evidence was manslaughter. This grew out of the fact that deceased used insulting language in the presence of and to defendant's wife in the absence of the defendant; and on the morning preceding the killing in the afternoon. The killing occurred at the first meeting after the insult had been given. The State then introduced several witnesses, who were permitted to testify, that they knew the reputation of the deceased, and that such reputation was that he was courteous and urbane in the presence of and towards ladies. Appellant did not put in issue the reputation of deceased. This was error. For case directly in point, see Moore v. State, 79 S. W. Rep., 565. The cases of Martin v. State, 6 Texas Ct. Rep., 267; and Everett v. State, 30 Texas Crim. App., 682, hold the contrary doctrine. The Martin case is based upon the Everett case, or rather refers to it as authority, and to Wharton's Crim. Ev., section 60. An inspection of the Martin case and the citation from Wharton will show that they were discussing a different question; to wit: the right of a defendant to place his character or reputation in evidence. Here the question was the right of the State to prove the good character of a witness to whom was imputed insulting conduct towards a lady. If

defendant had attacked the character of deceased in regard to his politeness or urbanity to ladies, then the State could have shown that he was polite and urbane to ladies. The Martin and Everett cases are overruled. The citation of authorities in the case, except Everett's case, are not in point. The Martin·case cites no authority in point, except Everett v. State, supra. The Everett case was decided without citing any authorities, and none seem to have been relied on to support the position of the court in that case. By reason of the decision of the Moore case, supra, which was rendered subsequent to the Martin and Everett cases, there is a conflict in the decisions of this court on the question. After a careful review of this question and authorities, we are of opinion that it is safer and better to follow the well known rule, and to overrule the Martin and Everett cases.

The court charged the jury, in regard to the issue of manslaughter, as follows: "The jury are further instructed, if they believe from the evidence beyond a reasonable doubt that defendant, Joe Melton, did unlawfully and voluntarily shoot and kill Ben Ellington, with a pistol, and you further so believe that previous to such killing, defendant had been informed by his wife that ·Ben Ellington (deceased) had used insulting language to her, and that defendant killed deceased at his first meeting with him after he had been informed of such insulting words, under the immediate influence of the passion arising in his mind from such information," etc. Objection was urged because it shifted the burden of proof and subverted the reasonable doubt; that by the language employed the court required the jury to believe beyond a reasonable doubt that, in order to reduce to manslaughter, that the insulting language was used, whereas if there was a reasonable doubt as to the use of such insulting language and conduct, defendant should have the benefit of that doubt. In other words, the charge gave the benefit of the reasonable doubt to the State against the defendant, and thus shifted the burden of proof. This contention is correct. Rockhold v. State, 16 Texas Crim. App., 577; Pitts v. State, 29 Texas Crim. App., 374. A special instruction was requested by appellant covering and correcting this error, which was refused. This special requested instruction presents the law of the case as applicable to that phase of it. If there is any conflict between the principle laid down here and that announced in Spangler's case, 42 Texas Crim. App., 233 and Spears' case, 56 S. W. Rep., 347, those cases to the extent of that conflict are overruled.

Another objection to this charge is, that not only had the reasonable doubt been solved against defendant in the instruction, but required the jury to believe beyond a reasonable doubt that the wife had informed appellant of such insulting conduct. A special charge was requested covering this phase of the case, to the effect, that if defendant was informed by his wife of the insults offered her, and acted upon such information in good faith it would be immateral whether the information was in fact true. If the defendant believed it and in good faith

acted upon it, it would as to him constitute adequate cause, whether in fact the insults had been offered or not. Jones v. State, 33 Texas Crim. Rep., 492.

The court charged the jury that the provocation must arise at the time of the commission of the offense, and that the passion is not the result of a former provocation. The adequate cause consisted of insulting language used by deceased to the wife of appellant in the morning prior to the homicide in the evening, appellant not being present. This was communicated to defendant when he returned home during the noon-hour. About 2:30 or 3 o'clock on the same evening the killing occurred. This seems to be the only predicate for manslaughter, if we understand this record correctly. This being true, the charge of the court should have submitted the isue of manslaughter upon the adequate cause constituted by the insulting conduct and language by deceased towards appellant's wife. Under this phase of the law, the provocation which forms the predicate for the passion need not arise at the time of the homicide. The facts here show that defendant was not present when the insulting language was used, but it was communicated to him some hours after its occurrence, and the killing occurred upon the first meeting. Orman v. State, 22 Texas Crim. App., 604.

There is another phase of the law perhaps necessary to notice, and which should be given upon another trial. Appellant testified that after his wife communicated the insulting conduct and language of the deceased to him, he sought deceased for an explanation and retraction; and with the further view, if the retraction was had and the explanation made, that the friendly relations would be resumed and continued between the parties. It is contended by appellant that the jury should have been informed in appropriate language that appellant had the right to seek deceased for a peaceable solution of the difference, and ask a retraction of the insulting conduct; and that in doing so, he had the right to arm himself to resist any anticipated attack from the deceased, relying upon the rule laid down in Shannon's case, 35 Texas Crim. Rep., 2.

Some of the conduct of the county attorney during the trial is criticised. We deem it unnecessary to discuss those matters because they hardly occur upon another trial.

For the errors indicated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

BROOKS, Judge.—I agree to the reversal, but think the Martin case is correct.