### Lee Paschal v. The State.

#### No. 3442.        Decided March 10, 1915.

#### Rehearing denied April 7, 1915.

**1.—Murder—Evidence—Intent to Kill—Motive.**

Upon trial of murder, there was no error in admitting testimony as to what occurred seven or eight years before the alleged homicide as to the treatment by the defendant of his wife, the deceased, showing a continuous course of ill-treatment from almost the day of their marriage until the night when the fatal injuries were inflicted by the defendant,—to show specific intent to kill, animus, motive and malice. Following Hall v. State, 31 Texas Crim. Rep., 565.

**2.—Same—Assault to Murder—Charge of Court.**

Where, upon trial of murder, the evidence showed conclusively that the deceased died from injuries inflicted upon her by the defendant some days before, there was no error in the court's failure to charge on the issue of assault with intent to murder. Davidson, Judge, dissenting.

**3.—Same—Aggravated Assault—Charge of Court.**

Where, upon trial of murder, the issue of aggravated assault was not raised by the evidence, but the court, nevertheless, submitted a special charge requested by the defendant on aggravated assault, there was no reversible error.

**4.—Same—Instrument Used—Charge of Court—Cruel Treatment.**

Article 1150, Penal Code, provides that where the circumstances attending a homicide show an evil and cruel disposition, or that it was the design to kill, the accused shall be deemed guilty of murder, though the instrument or means used may not in their nature be such as to produce death ordinarily; and where the acts of the defendant showed such state of facts, and the court properly submitted the same, there was no reversible error.

**5.—Same—Instrument Used—Charge of Court.**

Where the indictment alleged that the means used by the defendant in committing the homicide were unknown, and the evidence made it clear that what instrument he did use, if he used any, was one that the jury would be authorized to find was such from the mode and manner of its use likely to produce death, there was no error in the court's charge in submitting a proper charge thereon.

**6.—Same—Evidence—Dying Declarations.**

Where, upon trial of murder, there was some conflict of testimony as to whether deceased, when she gave a dying declaration, was rational or irrational

at the time, yet there was positive testimony that she was sane and conscious of approaching death, and no special charge was submitted on this question, although invited by the court, there was no reversible error.

Appeal from the District Court of Hill. Tried below before the Hon. Horton B. Porter.

Appeal from a conviction of murder; penalty, imprisonment for life in the penitentiary.

The opinion states the case.

*Shurtleff & Cummings* and *Walter Collins,* for appellant.—On question of intent to kill: Fitch v. State, 37 Texas Crim. Rep., 500; Shaw v. State, 34 id., 435; House v. State, 171 S. W. Rep., 206.

On question of admitting evidence as to transaction occurring several years before the homicide: Powdrill v. State, 62 Texas Crim. Rep., 442.

*C. C. McDonald,* Assistant Attorney General, for the State.

HARPER, JUDGE.—Appellant was convicted of the offense of murder, and his punishment assessed at imprisonment in the penitentiary for life.

A brief statement of the evidence should be made in order that the holding of the court may be clear on the various questions raised.

Mrs. Mattie Underwood testified that she knew deceased, "and up to two years ago she had washed for deceased off and on ever since she had married appellant; that she had heard defendant on various occasions curse and abuse his wife (deceased) from about two years prior to her death clear back to the time they were married."

Mrs. Barnes testified that she was the mother of deceased, and that deceased and appellant had been married ten years. During this time they had separated four times. The last time they remained apart for two and a half years, commencing to live together again about two years before her daughter's death.

W. A. Marlar testified that he had lived a neighbor to appellant and his wife something more than a year immediately preceding deceased's death; that on the night of the ice cream supper in Woodbury (fixed in the record as the 17th day of last July) his "attention was attracted to some smothered screaming at Lee Paschal's home. At the time I heard this smothered screaming I was lying on the bed and I got up and went out on the east end of the south porch, and I heard that smothered screaming, saying, 'Oh, Lord, don't kill me,' or 'You are killing me,' I could not tell which, and I heard Lee Paschal say, 'Come out of there you G—d d—n son of a b—ch, you have already cost me a thousand dollars.' That was Lee Paschal that said that; I recognized his voice. The first time that I heard the screaming it was just loud enough for me to hear it; seemed like it was down in a hole and smothered up or something, it was not distinct." He gave as his

reason for not going to the house, that these occurrences were common at the home of appellant while he lived close to him. That about six months before her death appellant's wife came to his home about 12 or 1 o'clock at night. He testified: "She ran in and fell on the gallery exhausted. She had her hand cut and wrapped up with a handkerchief or white piece of cloth or something of the kind. She come in and says, 'Mr. Marlar, I don't want to confuse you all, but I have come here for protection; Lee is after me trying to kill me.' Mrs. Bertha Paschal stayed that night and the next day at my house. Lee Paschal came up there the next morning and called for her. He came up to the gate and I was out there at the door that goes into the cellar, and I says, 'What do you want?' Lee says, 'I want Bertha.' He had a butcher knife in his pocket, about that long (indicating), with the blade sticking up, and he pulled it out and waved it around that way, and I says something to him and he left. Mrs. Paschal has been at my house twice, but I don't remember whether the other time was before the one I have just related or afterwards."

Curtis Marlar testified that on the night of the 17th of July he was awakened by the noise at appellant's house, and heard appellant say, "You G—d d—n son of a b—ch, you have already cost me a thousand dollars."

A. J. Paschal, the little nine-year-old son of appellant and deceased, testified: "Shortly before my mother died I remember my daddy coming home one night. I heard my daddy coming home, and mamma and I got up and went in an old room that we was not using and made us a pallet and went to sleep. When daddy first got home he hunted us and he couldn't find us, and he got a quilt and lay down and went to sleep and slept about an hour. When he woke up he got up and struck matches and found us. When he found mamma lying down on the pallet he says to her, 'Come out of there, G—d d—n you, you have already cost me a thousand dollars,' and he come in there and got a stick and he tried to hit her with it and he was so drunk she could outhold him. She would catch hold of the stick. He throwed things at her, but he didn't hit her. It was dark in there and I could not see what he was doing all the time. It was so dark I couldn't see. While daddy was doing this to mother she said, 'You are killing me'; she said that all the time. My mamma told daddy while he was in the room there hitting her with the stick and throwing things at her that he was killing her, and she got out of the room and got out on the gallery, on the front gallery. When she got out there daddy pulled her through the window by the hair of her head. After he pulled her through the window he never pulled her no further. She was on the gallery when he pulled her through the window, but I don't know whether she was laying down or standing up or what; I was in the house and it was dark and I could not see. Mamma was saying then that, 'Oh, you are killing me.'" He said his father was drunk that night; that he also tried to hit his mother with a seine, but he was so drunk he could not hit her with it. That "after daddy had hit

mamma she laid there on the pallet, after he had pulled her in the room through the window he told her he was going to set fire to the pallet; he would strike matches and stick the matches under the quilt, but the quilt would smother them." He says that his mother complained that her side hurt her; her head hurt and her back hurt. The next day he saw bruises on his mother's back.

Mrs. N. E. Sherrod testified that she went to see Mrs. Paschal on Saturday before she died, and in a conversation with her she asked her: "Bertha, what about the medicine? Lee is gone and Mrs. Paschal is gone, and I says, 'I don't know nothing about it.' 'Well,' she says, 'Granny Sherrod, it's no use to give me that old medicine, for how can I live?' she says, 'I am dying from mistreatment.' I says, 'Honey, how; what is the matter?' 'Well,' she says, 'Lee got drunk on that nasty old whisky and came in and just beat and kicked me all to pieces.' Well, I asked her where he kicked her. 'In the side and other places,' she said, 'but I am kicked all to pieces,' she says, 'He has told me, he accused me of turning him in and he told me he would kill me for it if it took him ten years.' "

The State, without objection, introduced an information charging appellant with making an aggravated assault on his wife on June 2, 1913, and his plea of guilty thereto.

Over the objection of the defendant the State was permitted to prove by Mrs. Pearlie Riley that some seven or eight years ago Mrs. Paschal was at her home on a visit and appellant came and tried to make her go home. That "he first came and asked where the men folks was and we told him—I told him where they was, and he went away and he came again, and the second time he came is when he raised a racket with his wife and told her that he was going to make her go home with him, and she refused to go and he just beat her and choked her—I thought he had killed her—and stamped her and cursed her. He beat her in the face first with his fists, and then he choked her about two or three minutes, choked her until she was right black and could not speak. I did not see him beat her with anything besides his fists. He tore off part of her clothes and taken his knife out and cut the rest of them off, and then he stamped her with his feet. She was right out in my yard when he stamped her, after he had torn and cut her clothes off of her." That he said at that time he was going to kill her.

Also over objection of appellant, Prof. S. P. Martin was permitted to testify that some seven or eight years ago he heard swearing and hollering at A. J. Paschal's house; that this attracted his attention, and he looked and saw deceased run out of the back door of the house and go around the house; that appellant was running after her cursing and swearing. That the language appellant used was very profane. This witness also testified that at the time of the death of Mrs. Paschal he lived near them. To quote his testimony: "I have heard the defendant, Lee Paschal, curse and abuse Mrs. Bertha Paschal during her lifetime. I heard of the death of Mrs. Bertha Paschal. I was in Woodbury at that time. I remember the Woodmen having an ice cream

supper along about some time in July at Woodbury. I heard cursing down there about that time, even that night, swearing, cursing and loud talking. I think that I would recognize his voice, and I did recognize it as being his voice. At one time during that night I heard something like someone hollering down there, but I could not say whether it was a child hollering or a woman hollering. I don't know, I wasn't there. I did hear someone hollering down there. I heard the defendant saying 'G—d d—n' or something to that effect, and I heard him say another time, at the same time, something about 'you have cost me so much,' but I didn't just exactly understand the amount he said; just cursing and swearing. I can't recall the exact language that he used, but it was very profane language. I heard the racket, of course; I could not well avoid hearing it, and I heard someone whom I took to be Mr. Paschal say 'G—d d—n you,' or something to that effect, 'You have done something,' and I think I understood him to say 'You cost me something,' but I could not say now what amount or what it was. He cursed on some little bit, swearing along about that time, and I think I heard someone seem to holler about that time, I could not say whether it was a child or woman or a man; I just heard the noise, but never paid very much attention to it at that time. I will have to say that I have heard him curse down there before that night, quite a number of times within the previous year or two or three years; that is, while he lived below me there."

Mrs. Lem Browning testified she is a cousin of appellant, and when his wife died she proposed to appellant that she and some other ladies present wash and dress the body. Appellant said he had an undertaker employed who would do this work. However, as the undertaker did not come for some time, the ladies did wash and dress deceased, and she says: "While we were dressing her for burial I saw some wounds on her body. There was one wound on her left side up and down this way (illustrating), and two on her back, and her abdomen was just out of its place somehow or another. The wound on the left side was a dark appearing place and it was swollen right smart and it was in a ridge, swollen up above the other flesh here. I don't recall whether the wound on the side was large or small, I don't remember about this; I could not say just how large it was, but it was way up above the other flesh, just swollen right sharp. It would cover a space of about four inches, I suppose. There were two wounds on the back, one right below the shoulders and one between the shoulders and the hip. This place down on her abdomen was discolored, but I don't know how large it was; it just seemed to me like it was just pressed up. It would cover a right smart space, about two or three inches, looked like to me."

Dr. J. D. Hunt testified that he was called in on July 20th,—three days after the witnesses fix the time that appellant made the assault, and about one week before Mrs. Paschal died. Appellant and his mother were present; that he was told nothing of the assault, and on making examination he found the womb misplaced; this he remedied, and as she had some fever he prescribed medicine for the trouble he

located and for the fever. At this time his attention was not called to the fact that her head was hurting her, but on a later visit he did ascertain that fact, and found her scalp sore, but he did not locate or discover any fracture of the skull. He was not informed at any time by appellant or deceased she had received any injury; however, before her death she suffered from lepto-meningitis, a disease produced by injury to the head. He said she died from the result of a fracture of the skull, which caused the lepto-meningitis.

At the time of Mrs. Paschal's death no one knew that she had received this fracture. However, as the ladies discovered the wounds on the body in dressing deceased for burial, the fact she died from lepto-meningitis, which is occasioned by an injury to the head, and other circumstances, caused an autopsy to be held, and Dr. Hunt testifies: "After this lady died I made an autopsy and examined her head. 'We bared the skull, taken the scalp off and bared the skull; we took the scalp and flesh and everything off, baring the skull. After doing that we found there was a fracture on the left side of the head just above the ear. It was on the parietal bone, the middle bone. There is two bones comes together here in a wedge shape like. I suppose this fracture was approximately something near two inches from the left ear and above it. The fracture was something over an inch, possibly an inch and a half, across from one surgical suture to the other. By suture of the skull, I mean where the skull comes together; this bone come down in a wedge shape this way, kind of, a little like the letter 'V,' and this fracture went right across the bone, all the way across the bone, a distance of something over an inch. That fracture definitely appeared; the skull bone was completely broken in two. I did not absolutely know of that fracture before I made this autopsy; I believed there was a fracture but I didn't know it, I could not make it out; in feeling, I could not feel any edges or anything, no depression, I could not feel any fracture at all. During her life there was no abrasion of the skin over that fracture that I could tell; the skin was just simply sore."

We have given a rather full synopsis of the testimony, mainly in the language of the witnesses, because appellant strenuously insists that the testimony of Prof. Martin and Mrs. Riley, relating the transactions that occurred some eight years prior to the time of deceased's death, was improperly admitted in evidence; that the court erred in not submitting the issue of assault with intent to murder, and in not instructing the jury in his main charge on aggravated assault.

As to the testimony, the court did not err in admitting it. The testimony, when taken as a whole, shows a continuous course of ill-treatment from almost the day of their marriage until the night of July 17, 1914, when the fatal injuries were inflicted by appellant. In the case of Hall v. State, 31 Texas Crim. Rep., 565, this court, in an opinion by Judge Davidson, collates the authorities, and holds such testimony admissible as evidence of a specific intent to kill, to show animus, motive and malice. The malice and intent to kill might not

be so clearly shown by the acts of appellant on the night of the 17th of July, but when we take his course of conduct running through his entire married life, it becomes clearly manifest, and especially is this true in the light of Mrs. Riley and Mrs. Sherrod's testimony. Mrs. Riley states that at the time she saw appellant curse, choke, beat and stamp his wife, he said he was going to kill her, and Mrs. Sherrod states that deceased told her she was dying from mistreatment; that appellant had kicked her all to pieces, and appellant had told her he would kill her if it took him ten years because she had reported him for making assaults on her. Not only is it the law in this State, but in the Encyclopedia of Evidence the rule is stated to be: "Express malice may be proved by any prior facts and circumstances indicating ill-will or hostility between the persons involved. Thus evidence of prior controversies and quarrels between persons is admissible. Also evidence of prior abuse or ill-treatment, or of prior assaults or affrays." (Vol. 8, p. 372, citing many authorities.) In addition to the Hall case, supra, Spears v. State, 56 S. W. Rep., 347, is directly in point.

Neither do we think the court erred in refusing to submit the issue of assault with intent to murder. If the evidence raised the issue that deceased died from some other cause than from the injuries inflicted by appellant, such an issue might be in the case. But the evidence and all the evidence shows conclusively that deceased died from the injuries inflicted on her by appellant on the night of July 17th. Appellant sought to inject the issue that she might have died from injuries otherwise received than at his hands, but in this signally failed. He placed his little boy on the stand and had him testify that his mother fell when she was running a cow, and fell off of a bluff on her head, the ground being rough and rocky, but on cross-examination the boy testified this occurred several months before his mother died,—"a long time ago." The physicians testify that it usually takes from three to five days from the time injury is received for lepto-meningitis to manifest itself. The injury, if any she received, when she fell while pursuing the cow, could not have been the cause of the condition that caused her death under the record before us. She could not have gone several months with a fracture of the skull of the character and kind shown by the evidence without some evidence of it being manifest.

While the court did not submit aggravated assault in his main charge, yet he did give the special charge requested by appellant submitting that issue to the jury. But take this record as a whole, we do not think that issue is raised. It may be and doubtless is not shown with what instrument appellant inflicted the injuries on his wife, but the character of injuries inflicted and his acts and conduct on that occasion manifest a specific intent to kill. His wife had hid from him; he searches for her, and when he finds her the first remark is, "Come out of there you G—d d—n son of a b—ch, you have already cost me a thousand dollars," and then assaults her with a stick, attempts to strike her with a seine pole, she asking him to desist, saying, "You are killing me," but when she gets loose and flees to the gallery, he pursues her,

drags her by the hair of the head back through the window, and inflicts on her additional injury. And while she lies prostrate on the floor on a pallet, he undertakes to destroy the evidence of his crime by attempting to set fire to the quilt on which she lay. His little son testified: "After daddy had hit mamma she laid there on the pallet, after he had pulled her in the room through the window, he went in there and tried to set the blanket afire, and told her he was going to set it afire, and he would strike matches and stick in there and he would lay it down and the match would go out. My mamma was lying there on the pallet when he would do that. He would just stick the matches under the quilt and it would smother out." If this does not manifest an intent to take life, it would be difficult to conceive a case which would do so, where the instrument used in inflicting the injuries is not shown. Appellant did not testify on the trial, and no witness disputes the facts stated by this little boy. While article 1147 of the Penal Code provides that the instrument or means used shall be taken into consideration in judging of the intent of the party making the assault, and if the instrument is not likely to produce death, it is not to be presumed that death was intended unless such intention appears from the manner of its use, yet article 1150 provides also, that where the circumstances attending a homicide show an evil or cruel disposition, or that it was the design to kill, he shall be deemed guilty of murder, though the instrument or means may not in their nature be such as to produce death ordinarily. How could one manifest a more evil or cruel disposition than this record discloses? The woman he had promised to love and protect was hunted down, cursed and vilified and assaulted. The bruises on her dead body show a most vicious assault. She flees, he pursues, drags her through a window by the hair of her head, and then attempts to set fire to the bedding on which she is lying prostrate. However, at appellant's request the court did submit the issue of aggravated assault in language chosen by appellant, and then at his request also instructed the jury: "You are instructed that even though you should believe from the evidence that the said Lee Paschal struck his wife, Bertha Paschal, and that by reason thereof she afterwards died, still if you have a reasonable doubt as to whether or not at the time he struck her, if he did, he intended to kill her, then you will give him the benefit of that doubt and acquit him of murder, and next inquire whether or not he is guilty of the offense of aggravated assault." He also gave the following special charge requested by appellant: "Even though you may believe from the evidence that the defendant assaulted his wife, and that on account of said assault her skull was fractured and that such fracture, if any, produced inflammation that resulted in meningitis which caused her death, yet, unless you are further satisfied from the evidence beyond a reasonable doubt that at the time he committed said assault, if any, he had the specific intention of killing the deceased, you can not convict the defendant of murder."

Those criticisms of the charge of the court which complain that the

court erred in instructing the jury that if they found beyond a reasonable doubt that appellant "with his hands or with his feet or with any instrument or object or in any manner unlawfully killed Bertha Paschal, and you further believe from the evidence beyond a reasonable doubt that the instrument or object used, if any, by the defendant was a deadly weapon," etc., are without merit. The indictment alleged that the means used were unknown. By the evidence hereinbefore recited it is shown it was not made clear what instrument he did use in inflicting the injuries, but whatever he did use was one that the jury would be authorized to find it was an instrument, from the mode and manner of its use, likely to produce death. This is shown by the injuries inflicted on the person of his deceased wife. The language is not upon the weight to be given the evidence, and the charge does not suggest that it is the opinion of the court that appellant had killed his wife, but properly submits the issue to the jury for their determination.

Special charge No. 1 was fully covered by special charge No. 2, given at appellant's request, and, therefore, it was unnecessary to give it.

The only other question we deem it necessary to discuss, and the only one that in our opinion raises an issue about which there could be any serious doubt, is the bill that contends the court erred in not submitting the question of whether or not Mrs. Paschal was rational at the time she made the statement to Mrs. Sherrod. At the time this testimony was introduced there was no question raised as to its admissibility on this or any other ground. However, when Dr. Hunt was testifying he said, "It must have been something like Thursday or Friday before Mrs. Paschal died that she began to get delirious, unconscious or irrational. She remained unconscious from that time until she died. It might possibly have been a little later than that she became unconscious. I do not remember the days." He gives it as his opinion that she was irrational on Saturday. This is the day Mrs. Sherrod testified she was at Mrs. Paschal's home and she made the statement to her. It is made certain that Dr. Hunt was not present when Mrs. Sherrod was at the home of Mrs. Paschal on Saturday. He says he would not be certain he was at the house on that day. When the court gave appellant his charge, and they had filed their objections thereto, he stated to them he would give them time to prepare special charges "covering every one of the exceptions or objections thereto." Appellant did prepare a number of special charges, and the court gave five of them, yet appellant prepared none on the question of whether or not the testimony of Mrs. Sherrod should or should not be considered by the jury. It would have been proper for the court to have instructed the jury that unless they found from the evidence that at the time Mrs. Paschal made the statement to Mrs. Sherrod she was sane, that is, she was rational and in possession of her faculties, they would not consider the testimony of Mrs. Sherrod, for the testimony of Dr. Hunt would tend to raise the issue that she might have been irrational at the time. However, Mrs. Sherrod is very positive that Mrs. Paschal was sane and conscious of approaching death. Dr. Hunt was not present at

that time, and is not very positive as to the time Mrs. Paschal became irrational, and as the court informed appellant's counsel that he would give them time, and desired them to present a special charge covering each and every objection they had to the charge, and while presenting a number, presented none on this issue, we are of the opinion that it is not such error as would call for a reversal of the case.

The judgment is affirmed.

*Affirmed.*

DAVIDSON, JUDGE.—I believe the judgment ought to be reversed, and mention one question specially, that is, a charge ought to have been given submitting the issue of assault with intent to murder. The evidence, in my judgment, is not sufficiently strong to exclude the idea that the deceased may have died from causes other than the assault by defendant. I do not care to write at length.

[Rehearing denied April 7, 1915.—Reporter.]