## SID WILLIAMS v. THE STATE.

No. 2801.    Decided March 4, 1914.

Rehearing denied April 15, 1914.

**Murder—Charge of Court—Statutes Construed—Justifiable Homicide.**

Where, upon trial of murder, it appeared by defendant's confessions that he intentionally shot and killed his wife while she was in the act of copulation with another man, this, under article 1102, Penal Code, would be justifiable homicide, and where the court charged that if defendant shot at his wife's paramour and accidentally struck her, he should be acquitted, the same was reversible error, although there was testimony as to such accidental killing, yet the State having introduced defendant's confessions, the issue should have been submitted to the jury. Davidson, Judge, points out other errors to which majority does not agree.

Appeal from the District Court of Kaufman. Tried below before the Hon. F. L. Hawkins.

Appeal from a conviction of murder in second degree; penalty, fifty years imprisonment in the penitentiary.

The opinion states the case.

*Wood & Marrow* and *S. J. Osborne,* for appellant.—On question of justifiable homicide: Price v. State, 18 Texas Crim. App., 474.

*C. E. Lane,* Assistant Attorney General, and *J. S. Terry,* County Attorney, for the State.

DAVIDSON, JUDGE.—Appellant was convicted of murder in the

second degree, the jury assessing his punishment at fifty years confinement in the penitentiary.

In making a statement of this case it is fairly correct to state that appellant's wife, deceased, had conducted herself in such way as to show she had been unfaithful to her marital vows, and had been sufficiently indiscreet as to be guilty of illicit intercourse with other men. These matters brought trouble between appellant and his wife. It became sufficiently notorious for his landlord to request and appellant to comply with the request to move her from his landlord's premises. On two occasions she left appellant, and it is a correct conclusion to state she had ceased to care for him, and was guilty of the indiscretion above mentioned.

Appellant's testimony is, substantially, that on the night previous to the homicide the following morning he had made arrangement to haul wood from a point about four or five miles distant from his residence. A young man who lived on the place was to accompany him and drive the wagon. They left early the next morning, about or before day; at least, very early in the morning, the young man driving the wagon, appellant going a nearer way afoot to join him at a designated point. Appellant did not join him but returned to a ravine. He testifies the night before he heard Jim Pollard, a cousin of his wife, and his wife talking, in which conversation a date was made between them by which they were to meet at a ravine a few hundred yards from his residence; that instead of going after the wood he returned to this ravine and watched. The parties did not make their appearance at the ravine, but later he saw his wife and Pollard meet behind the barn; his wife laid down as did deceased, in some weeds; that he immediately went to where they were, and as he approached Pollard jumped up, as did his wife, she pulled down her clothing, and they ran towards the house, he pursuing them. As Pollard ran towards the house and when near it he picked up an axe and entered the house. His wife picked up a stick of wood and entered the house. Appellant immediately entered the house; they had some discussion, and Pollard threatened to kill him and made a "plunge" at him. Appellant shot at Pollard and shot his wife. His wife immediately ran out of the house, something like one hundred yards, where she fell and died. He shot Pollard two or three times but Pollard survived and testified on the trial. There is evidence also to the effect that he had previously caught Pollard and his wife in the act of intercourse on a bed in his room. This may be sufficient, so far as the defensive theories are concerned.

A State's witness who claims to have been present at the house of appellant at the time of the trouble controverts appellant's statement as to the matters occurring in the room, as to the attack of Pollard on appellant, and as to shooting the wife in the house. The State's theory, without going into details, is that appellant shot Pollard in the house and while he was doing so his wife left the room; that he pursued and shot

her at a distance of something like one hundred yards from the house. The State also controverts the fact by a witness as to the probabilities or possibilities that Pollard and the wife of appellant could have been engaged in the act of intercourse or been seen by appellant in a compromising position, about which he testifies. This witness does this more by the process of elimination than by positive evidence. He was not out of the house, while Pollard and the wife of appellanut were out of the house. But he states they did not have the time to engage in the matters about which appellant testified, and that if so he could have known it. The substance of his testimony by the circumstances and incidents goes to show that Pollard and the wife of appellant did not have the time to do what appellant says he caught them doing, and, therefore, that phase of appellant's testimony is not true. Pollard was used as a witness, and he denied the matters testified by appellant, so far as the act or attempted act of intercourse at the barn and his intimate relations with appellant's wife are concerned. The families were intimate, being neighbors, and related, the wife of appellant being the cousin of Pollard. It is also in evidence that a young man who was to drive the wagon for the wood had the night previous to the homicide slept in Pollard's house, but he came home early in the morning to go with appellant after the wood. This young man was requested by appellant to borrow a gun that was at Pollard's. Appellant's evidence is to the effect that he wanted to borrow a shotgun. The young man borrowed a pistol from Mrs. Pollard. He seemed to have understood that appellant wanted a pistol; both agree defendant used the word gun. This seems to be the only pistol at Pollard's house, and there is some evidence to the effect that Pollard was the owner of the pistol instead of his wife. Anyway, the young man brought this pistol to appellant's house. Immediately after appellant and the young man left appellant's residence going to haul wood, Pollard came to appellant's residence. The facts are uncontroverted on this line, and also that he did not return home for breakfast, and was carried home after being shot by appellant. This is a sufficient statement of the case to bring in review the questions raised for revision.

1. There was a bill of exceptions reserved to the introduction of some statements or purported confessions made by appellant on two occasions. The evidence fairly shows he was under arrest at the time they were made. His contention is that these matters were inadmissible, because it was not shown he was warned, and there was no evidence that he signed the statement. These confessions or statements were in writing, and are found in the statement of facts but are not copied in the bill of exceptions nor referred to in statement of facts and made part of the bill. Therefore, under the authorities the bill is insufficient to require this court to revise this ruling of the trial court. Without going into any discussion of this matter we would say if upon another trial these matters are offered in evidence the State should be required under terms of the statute to connect up the matter fully before introducing the confessions or written statements. The burden of proof is on the State when confes-

sions of this nature are sought to be introduced against the accused to show their competency. This matter is discussed in Thomas v. State, 35 Texas Crim. Rep., 178. This much is said in reference to this matter in view of another trial.

2. Appellant contends the court erred in not charging upon self-defense. We are of opinion this proposition is correct. The defendant testified that as Pollard ran into his, appellant's, house he picked up an axe. He does not say positively that he carried the axe in the house, but he testifies as he ran in the house he picked up the axe, and that his wife picked up a stick of wood. After getting in the house and during their little discussion in there he says Pollard "plunged" at him, and he thought he was going to kill him and he shot him. The court may not have believed appellant in view of the State's testimony and from the circumstances, but that is immaterial. Defendant testified to the fact which would raise the issue of self-defense, and the jury was to judge this matter under appropriate instructions. Wherever the testimony raises an issue, weak or strong, that is beneficial to the accused, it is the imperative duty of the court to submit that issue under appropriate instructions for solution by the jury.

3. The court gave this charge on manslaughter: "Now, if you believe from the evidence beyond a reasonable doubt that the defendant, Sid Williams, with a pistol, which was a deadly weapon or instrument reasonably calculated and likely to produce death by the mode and manner of its use, in sudden passion aroused by an adequate cause, with intent to kill, did shoot said Lizzie Williams, and thereby kill her, you will find defendant guilty of manslaughter, and assess his punishment at imprisonment in the penitentiary for any term of not less than two nor more than five years." Various objections are urged to this charge. We think this charge is subject to criticism in that it placed the burden of proof upon appellant and requires the jury to believe beyond a reasonable doubt that the matters occurred which would reduce the killing to manslaughter before they could acquit of murder and convict of manslaughter. This is not the law in Texas. See Eanes v. State, 10 Texas Crim. App., 421; Huddleston v. State, 54 Texas Crim. Rep., 93; Melton v. State, 47 Texas Crim. Rep., 451. These are sufficient number of cases to cite on this proposition. The reasonable doubt is in favor of the defendant; the burden of proof is on the State.

4. The court gave the following charge: "Our statute provides that homicide is justifiable when committed by the husband upon the person of any one taken in the act of adultery with the wife, provided the killing take place before the parties to the act of adultery have separated." This is subdivision 19 of the charge. Subdivision 20 is in the following language: "If you believe from the evidence that defendant discovered his wife, Lizzie Williams, and Jim Pollard in the act of copulation or about to engage in such act, and before the two had separated, that defendant shot at Jim Pollard, and that a shot intended for Jim Pollard accidentally struck and killed Lizzie Williams, then you will acquit the

defendant." We suppose this charge was intended to comply with article 1102 of the Revised Penal Code, which reads as follows: "Homicide is justifiable when committed by the husband upon the person of any one taken in the act of adultery with the wife, provided the killing take place before the parties to the act of adultery have separated."

It has been held in accordance with this statute, that where the husband apprehends his wife in the act of adultery or copulation and slays before the parties have separated, he is guilty of no grade of homicide. Massie v. State, 30 Texas Crim. App., 64; Morrison v. State, 39 Texas Crim. Rep., 519; Price v. State, 18 Texas Crim. App., 474; Gregory v. State, 50 Texas Crim. Rep., 73. The criticism of this charge by appellant is, that the court did not explain to the jury the meaning of the term "taken in the act of adultery," and also the term "before the parties to the act of adultery have separated." These exceptions to the charge were well taken. For full discussion of this matter see Price v. State, 18 Texas Crim. App., 474. As this charge is given the jury may well have concluded under the facts, without appropriate instructions, that they could not give appellant the benefit of this statute unless the appellant shot and killed at the very time of the act and while the parties were behind the barn. They might further have concluded from this charge that there must be shown by positive evidence the physical fact of intercourse or copulation. This statute does not mean either. It is not necessary to prove by positive facts that the defendant saw the parties in the actual act of intercourse. This may be proved by circumstantial evidence as well as by positive evidence. The circumstances may surround the matter in such condition as would lead appellant to believe or know, or any other reasonable man to believe and know that the parties were in the act of intercourse, or about to engage in it or had just engaged in it. This would justify under the statute if the killing occurred before the parties separated. Under this charge the jury may also have been led to believe that before the killing could be justified that the adultery must occur at the time and immediately while the act was going on. This statute does not convey that idea, nor was it intended to convey that idea. On the contrary, it was not intended by this statute to limit the justifiable killing to the immediate act of carnal intercourse, that is, while the parties were in the act. More than that, the court should in this charge have instructed the jury what adultery meant under this statute so that the jury might intelligently pass on appellant's rights under his view of the case and under the testimony introduced by him to sustain that view.

Again, we are of opinion the court should have instructed the jury pertinently and clearly what is meant by the statute when it uses the expression "before the parties to the act of adultery have separated." Would the jury infer from the charge of the court that the killing must occur at the barn before the parties left the place where appellant said he caught them? How far would they have to go, or what would have to be done in order to show what this separation meant? Our law does not mean, nor has it been construed to mean, that appellant's right or justi-

fication is limited to the immediate act of the woman and the paramour getting apart at the time of the illicit intercourse. It means more than that. It says before the parties have separated. How far they may go before they separate is not so much the question, but they must separate at some point and get away from each other. Here there was no separation as we understand appellant's testimony. It is true they did not return to the house together coupled up in the act of copulation. This they could not well have done, being a man and a woman, but they immediately proceeded from where appellant caught them together, ran in the house together, in the room together, and appellant immediately followed them, and it was there that the trouble occurred, and it occurred quickly after reaching that point. In Price v. State, supra, there Presiding Judge White of this court takes up this question and discusses it in a masterly manner as was usual with him, and his custom. He discusses the statute from the viewpoint of manslaughter, in those States where this character of intercourse was manslaughter, noting the fact that Texas was peculiar in having a statute of this sort which made it justifiable homicide, whereas the other States made it manslaughter. Quoting from that opinion, Judge White said:

"We are not aware that a similar statute, making such a homicide justifiable, can be found in the Codes of any other State; though the principle and precedent from which ours is derived is of most ancient origin. But in most, if not all, the States, as at common law, a killing under such circumstances would reduce the homicide from murder to manslaughter.

"Blackstone says: 'So, if a man takes another in the act of adultery with his wife, and kills him directly upon the spot, though this was allowed by the laws of Solon, as likewise by the Roman civil law (if the adulterer was found in the husband's own house), and also among the ancient Goths, yet in England it is not absolutely ranked in the class of justifiable homicide as in case of a forcible rape, but it is manslaughter. It is, however, the lowest degree of it; and therefore in such a case the court directed the burning in the hand to be gently inflicted, because there could not be a greater provocation.' (4 Black. Com. (Chitty), side, p. 191.)

"Mr. Bishop states the rule as it now obtains thus: 'If a husband finds his wife committing adultery, and, provided by the wrong, instantly takes her life or the adulterer's, . . . the homicide is only manslaughter. But if on merely hearing of the outrage he pursues and kills the offender, he commits murder. The distinction rests on the greater tendency of seeing the passing fact, than of hearing of it when accomplished, to stir the passion; and if a husband is not actually witnessing the wife's adultery, but knows it is transpiring, and in an overpowering passion, no time for cooling having elapsed, he kills the wrongdoer, the offense is reduced to manslaughter.' (2 Bish. Crim. L. (7th ed.), sec. 708.)

"Our statute uses the expression 'taken in the act of adultery with

the wife.' The question is as to the proper meaning or construction of these terms. Do the words, when properly construed, mean that the husband must discover, find, or see the wife and adulterer in the very act of illicit intercourse or copulation in order to constitute the offense denominated 'taken in the act ·of adultery?'

"Such positive proofs of the commission of the crime of adultery are not required, and are rarely attainable. As a crime, adultery itself may be established and proven by circumstantial testimony. (Richardson v. State, 34 Texas, 142.) Should the law hold the husband to a greater or higher degree of proof than it itself requires to establish a given fact? It is a late hour of the night,—the parties are found in a corn crib some distance from the house, lying down in the dark. They refuse, at first, to answer when called; then, when the wife answers, she denies that anyone is with her,—when deceased gets up he clutches the gun,—defendant finds that the one whose previous conduct and 'carrying on' with his wife has excited his suspicions is the one he has thus found in company with his wife. What would any reasonable, sensible man have concluded from these circumstances? In other words, how did the matter reasonably appear to defendant? To him are not these facts 'confirmations strong as proofs of holy writ?' Could it have been otherwise than that he had caught the parties in the act of adultery, either just as they were about to commit, or just after they had in fact committed· it? His voice when he called, perhaps, had arrested them in the very act of carnal coition, and if that were so, then were not the parties caught or taken by him in adultery? Does not the law always estimate a man's right to act upon reasonable appearances? Taking into consideration the res gestae,—taking the acts of the parties and their words coupled with their acts,—and were not the appearances of a character such as would have created the reasonable apprehension and conviction, in a person of ordinary mind, that the parties thus taken were taken in the act of adultery?"

Now the facts in the instant case were fully as strong or. stronger than those quoted above in the Price case. They have been already quoted, and it is unnecessary here to repeat them. Quoting from State v. Pratt, 1 Houston's Delaware Reports, 249, the following ,is made by Judge White from that case:

"'If the husband find another in the act of adultery with his wife, and in the first transport. of passion excited by it then and there kills him, it will not be murder, but manslaughter only. It is not necessary, however, that he should witness an act of adultery committed by them. If he saw the deceased in bed with his wife, or leaving it, or found them together in such a position as to indicate with reasonable certainty to a rational mind that they had just then committed the adulterous act, or were then about to commit it, the effect will be the same; and if, under such circumstances, the mortal blow was then and there given, the killing will be manslaughter merely.'"

Quoting again from Judge White's opinion we find this: "As to

a proper construction of the expression 'taken in the act,' we can not believe that the law requires or restricts the right of the husband to the fact that he must be an eye-witness to physical coition of his wife with the other party. As we have seen, adultery can be proven by circumstances, and the circumstances in this case were not hearsay so far as this defendant was concerned; they transpired in his own presence, sight and hearing. A mistake may possibly exist as to the fact; 'but if a person laboring under a mistake as to a particular fact shall do an act which would otherwise be criminal, he is guilty of no offense,' (Penal Code, art. 45), provided it be such mistake as does not arise from want of proper care on his part. (Penal Code, art. 46.) A party may always act upon reasonable appearances, and his guilt depends upon the reasonableness of the appearances, judged of from his own standpoint."

Quoting further, Judge White uses the following language from Mr. Bishop: "If a husband is not actually witnessing his wife's adultery, but knows it is transpiring, and in an overpowering passion, no time for cooling having elapsed, he kills the wrong-doer, the offense is reduced to manslaughter," citing State v. Holmes, 54 Miss., 153; Biggs v. State, 29 Ga., 723; Cheek v. State, 35 Ind., 492. And to the same effect is Miher v. State, 10 Mich., 212.

Judge White further says: "If the offense would be manslaughter at common law, as in most of the other States, it would in like circumstances be justifiable homicide under the special provisions of our statute." (Penal Code, art. 1102.)

In the Price case the court gave this charge predicated upon the statute: "If the jury find that the defendant shot and killed the said Chandler at the time and place as alleged, and it also appears from the testimony that defendant shot and killed said Chandler when taken in the act of adultery or carnal intercourse with the wife of the defendant, and before they (Chandler and the wife) had separated, then they will find him not guilty." Quoting from Judge White further: "The very gist of the issue made by the facts in the case was as to whether the facts tended to show that the parties were 'taken in the act of adultery,' and in all such cases, we imagine, the principal contest will be as to that fact. Such being true, it is a part of the law of such cases that the jury should be properly instructed as to what is meant by the expression 'taken in the act.' Without some explanation of the phrase, a jury would scarcely be able to comprehend and understand its import, so as correctly to apply it to the facts. They would, perhaps, be most likely to interpret it as meaning that the parties must be taken in the very act and process of carnal intercourse and copulation.

"Again: it was important that the jury should have been instructed as to the meaning of the other expression used in the statute,—'before the parties to the act of adultery have separated.' Giving the language a too liberal construction, they might infer that it meant that the parties must be physically united with the rem in re, in the act of copulation, and that it would be a separation though they might still be in the same

bed or same room. Evidently the statute means no such thing, and contemplates only that the parties are still together in company with each other, after the act, when the homicide is committed.

"Again, it is most clear that the word 'adultery,' as used in the statute, can not be, or mean, the adultery which is defined as a specific offense by the Code, and which is 'the living together and carnal intercourse with each other, or habitual carnal intercourse with each other,' etc., of a man and woman, etc. (Penal Code, art. 333.)

"It can not be that statutory adultery must be shown by a husband justifying under the law we are discussing. Evidently ecclesiastical adultery is meant,—adultery as it is known in common parlance,—'violation of the marriage bed,' whether the adultery consisted of but one or more acts, or whether the parties lived in habitual carnal intercourse or not. It was part of the law of the case that 'adultery,' as used in this statute, should have been explained to the jury."

I have thus quoted liberally from Judge White's great opinion. It is so clear, lucid and convincing that it ought to settle these questions. The criticism, therefore, by appellant of the charge given is clearly correct. The court committed a fatal blunder in failing to instruct the jury as it should have done on these phases of the statute.

There is another question which is deemed necessary to mention. The court limited appellant's right to kill to the fact that he shot at Pollard and incidentally killed his wife. We are of opinion that this is too restrictive, though the question is not raised. We simply call attention to this so upon another trial this may not arise. If the common law and the authorities cited in this opinion, supra, lay down the correct rule as to manslaughter, where the husband had the right to kill his wife subject to punishment for manslaughter, and then our statute means the same thing as to justifiable homicide. If Judge White is right, appellant would be also justified in killing his wife intentionally as well as incidentally in shooting at Pollard. We call attention to this for another trial, and we do this for the reason that the State's evidence shows that the woman was pursued out of the house something like one hundred yards and there shot and killed after a scuffle between them, and the jury may have well concluded in this connection that appellant was not correct in his testimony as to shooting her in the house, because she was shot in the head over the right ear, the ball coming out from the top of the head. She would hardly be able to run one hundred yards after a wound of that sort. The writer would not say she could not, but in all probability she was not able to do so. The writer wants to say he has never yet been able to find any definite rule that controls actions of wounded people. Pages might be written enumerating illustrations where apparently fatal wounds through the brain did not eliminate the power of speech or power of reason, and locomotion and even men have gotten well after they have been shot in the brain. But the writer is not going into a discussion of those matters. This phase of the case is especially called to the attention of the court also with reference to the

question of manslaughter. If appellant's mind was so aroused by the act of intercourse he had seen and by incidents following it and connected with it, that it was incapable of cool reflection and he killed his wife for the reasons indicated, although he had chased her away from the house, still he might not be guilty of anything higher than manslaughter. Of course, most of these matters are incident to and connected with the defensive theory. It is not intended to make the defense the paramount issue in the case, but it is intended here to say that every issue presented by the evidence beneficial to defendant must be given in appropriate charges. This defendant was given fifty years for murder in the second degree. It might be that the jury would have found him guilty of no higher offense than manslaughter even if they should find under all the facts and circumstances and that the parties had so thoroughly separated that justifiable homicide was out of it.

We have examined this record with some degree of care; it is entertaining in many respects, and the matters have not often been discussed and decided by the court in this State, but there seems to be no reason given in this record for the trouble from either standpoint, except the illicit relations between Pollard and appellant's wife. It is true, he had been jealous of other men, and she had been, to say the least of it, more than indiscreet with them. If the testimony is to be credited appellant believed that she was intimate with Pollard. The families to this time had been friendly, related by consanguinity, marital relations, friendship, and all those ties that bind human families together, and for this reason appellant assigns this jealousy and his act in killing. He predicates the reason for the fearful step he took in taking the life of his wife and shooting her paramour upon this illicit intercourse. We have looked for some other reason in the record. If the State's theory is right, then the act of intercourse did not occur, but even from that standpoint the conduct of the woman and Pollard and the jealousy of the appellant of Pollard are shown beyond any question. There is no other reason assigned.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*

### CONCURRING OPINION.

PRENDERGAST, PRESIDING JUDGE.   HARPER, JUDGE.—In agreeing or concurring in the reversal of this case, we do so upon one ground only. The court instructed the jury: "If you believe from the evidence that defendant discovered his wife, Lizzie Williams, and Jim Pollard in the act of copulation or about to engage in such act, and before the two had separated that defendant shot at Jim Pollard, and that a shot intended for Jim Pollard accidentally struck and killed Lizzie Williams, then you will acquit the defendant." The State introduced the following confession of defendant:

"I, Sid Williams, do hereby state that I have been warned by J. S. Terry, county attorney of Kaufman County, Texas, in the presence of

J. B. Warren, constable, and Mr. E. P. Piper, a citizen of Terrell, that I do not have to make any statement concerning the offense with which I am charged, and that if I do make a statement same may be used against me upon my trial for the offense with which I am charged, or either of them, and after such warning I have voluntarily made in the presence of said persons, and to the said county attorney, the following statement, towit:

"I started off to work and came back and found my wife and cousin on the bed, and he was on her. They were in the room this way, the south room. I stepped in the back kitchen door, and I could see them good. The door runs straight through and I saw them, and went under the shelf in the north room and got my gun and his and shot them. I do not think I said anything before I shot them, I do not remember saying anything. I shot the woman first. I hit her the first time I shot. I shot her in the top of the head. The man jumped up to run. He did not get no further than the door. I shot him two or three times before he could get away from the bed. I shot him in the door. She ran out and fell about 100 yards from the house. I do not think I shot her but once on the bed. I did not go out to where she fell until Mr. Warren came. I did not follow her out then. I went to Mr. Bunley's immediately after the shooting. I phoned for Mr. Piper at Levy's. I told them I had killed them. I intended to kill them. I never went back into the house any more until Mr. Warren came. I do not believe I went in the house then. Mr. Warren is constable. I had his pistol and mine too. The boy who was working with me went down there the night before and he brung the gun back. The boy's name is John Hall. We were going to the timber and I said to tell Jim Pollard to send me his shotgun as we were going to kill some squirrels. This man's name was Jas. Pollard. The boy brought the pistol by mistake, and I laid it up on the shelf, and told him he had brung the wrong gun. I started to the timber that morning before the shooting. I had got right at Tolbert's, about a mile away. I saw his hand, Grant, out about the lot. I did not talk to him. The boy told me before he left he could get the wood without me, and I was aiming to put out some onions, and I turned back to put them out. I went in the back door. I suspicioned something when I got near the house, and I went on around to the back. The children were all down the road apiece. I have three children. They were all down the road. There was nobody about the house. I went in at the back door. There are three rooms in the house. When I first got to the house I went into the shed room on the west side of both of the other rooms, and saw James Pollard and my wife on the bed in the south room. There was a door leading into that room from the shed room, and another door leading from the shed room into the north room. I went into the north room and got the two pistols off of the shelf. Then came back to the door leading from the shed room to the south room, and shot my wife in the top of the.head first, while she was on the bed. I shot him two or three times in the face before he could get off the bed.

He fell right at the door near the stove. This door leads into the north room from the south room. I know I shot after he fell because he was scuffling and trying to get up. My wife jumped up off the bed and ran out at the same door through the north room, by which James Pollard fell. James and my wife were cousins. I had been suspicious of my wife and James about two or three weeks. Before that time I never thought anything was wrong with them. I have seen them together several times before this. I never saw them on the bed before, but I came up on them out in the crib together before. I never did catch them in the act before yesterday. I have seen her doing the same thing with others. I have caught her in the bed with a fellow who worked on the Grinnan farm by the name of Ellis. That has been about two months ago. The other fellow was named Henry Berry. We have been separated. We separated about July. She said some of her folks were dead down east and she left me and went down there, and then she came back and then she went to Dallas and got sick, and sent for me, and I went and brung her back. We were separated about a month. My wife had on a long black coat and had on a dress. He had on I believe a Sunday coat, and a cotton striped jumper and a pair of overalls. His pants were unbuttoned. He had on a pair of overalls with a bib on. The bib was not down. He did not have time to button his pants. He was trying to get away.

"This statement was read over to me before signing, and I understand same and it is correct.

"Sid Williams.

"Witnessed by:
  "J. B. Warren,
  "E. P. Piper.

"On this 15th day of February, 1913.

"All this happened yesterday morning, February 14, 1913, on the Levy farm about three miles north or northeast of Terrell.

"Sid Williams.

"Witnessed by:
  "J. B. Warren,
  "E. P. Piper."

It is thus seen that in this confession appellant states he *intentionally shot his wife* while in the act of copulation with James Pollard. If this is true, this would be justifiable homicide under article 1102 of the Penal Code. It will be noticed in the charge above copied it is stated if appellant "shot at Pollard and *accidentally* struck his wife he should be acquitted. It is true that on the trial of the case appellant testified that he shot his wife accidentally while shooting at Pollard, yet the State had introduced this confession of appellant, and the issues made by it should have been submitted to the jury, and because this was not done we concur in a reversal of the case, but we do not agree to the statement of the case as made in the opinion reversing the case, nor that any other

error is presented by the record. It would serve no useful purpose for us to state the record as we view it, for it is filed here.

[Rehearing denied April 15, 1914.—Reporter.]