## THOMAS AKE ET AL. v. THE STATE.

A confession of one of the accused that he and the others had committed the homicide is not evidence against the defendants.

Confessions, to be admissible under the Code of Criminal Procedure, must be made under the circumstances contemplated in articles 661 and 662, (Paschal's Dig., Arts. 3126, 3127.)

The degrees of murder in Texas are thus defined by articles 607 and 608 of the Penal Code: "Every person with a sound memory and discretion, who shall unlawfully kill any reasonable creature in being within this state, with malice aforethought, either express or implied, shall be deemed guilty of murder. Murder is distinguishable from every other species of homicide, by the absence of the circumstances which reduce the offense to negligent homicide or manslaughter, or which excuse or justify the homicide. All murder committed by poison, starving, torture, or with express malice, or committed in the perpetration, or in the attempt at the perpetration, of arson, rape, robbery, or burglary, is murder in the first degree, and all murder not of the first degree is murder of the second degree." (Paschal's Dig., Arts. 2266, 2267, Note 672.)

In the exhaustive opinion of Mr. Justice Roberts in McCoy v. The State, (25 Tex., 33,) murder in the first degree is thus explained: "When one with a sedate, deliberate mind, and formed design, doth kill another, which formed design is evidenced by external circumstances discovering that inward intention, as laying in wait, antecedent menaces, former grudges, and concerted schemes to do him some bodily harm." (4 Blacks. Com., 199.)

Webster thus defines sedate: "Sedate is derived from *sedo, sedatus, sedare,* a Latin verb, which signifies, to allay, to calm; sedate means settled, composed, calm, quiet, still, serene, unruffled by passion, undisturbed, contemplative, sober, serious." (Webster's Dictionary.) 1. A sedate mind—that is, an unruffled mind, undisturbed by passion—that is, at repose, tranquil, and serene; and in this condition of the mind this formed design must originate;

2, formed design; this must flow from and be the conclusion arrived at by the exercise of the reasoning faculties. (Dale v. The State, 10 Yerger; Wright's O., 421; McCoy v. The State, 25 Tex., 33, and authorities there cited.) Hence it follows that the act must be preceded by deliberation of the mind upon its deadly purpose.

At common law, "when the fact of killing is established, the presumption of law is that it is done upon malice aforethought, until the contrary appear; therefore the circumstances ruled on to extenuate, excuse, or justify, if they do not arise out of the evidence of the prosecution, must be introduced and proved on behalf of the accused, or it is murder."

APPEAL from Williamson. The case was tried before Hon. JOHN IRELAND, one of the district judges.

Charles Thompson, Thomas Ake, Elijah Oates, and David Williams, all freedmen, were indicted for the murder of William Dobbs.

The substance of the principal evidence is given by the learned judge, hence a more consecutive statement is omitted.

Thompson severed, and was tried alone.

*Coffee, Houghton & Montgomery*, for appellant.

*E. B. Turner, Attorney General*, for the state.

CALDWELL, J.—The defendants, together with Charles Thompson and Elijah Oates, were indicted at the spring term of the district court of Williamson county for the murder of William Dobbs.

A trial was had at the same term, (Charles Thompson having severed,) and defendants, Ake, Williams, and Oates, were convicted of murder in the first degree. All the defendants moved for a new trial, which was awarded as to Oates, and overruled as to the two other defendants, who prosecute this appeal.

There was an application for a continuance by all the defendants, which was overruled by the court, to which ruling the defendants excepted, and now assign as error.

The view we shall take of the case supersedes the necessity of examining this point very critically, and we therefore dismiss it, with the remark, that we can discover no error in the ruling of the court refusing the continuance. The other assignments of error are as follows:

2. The court erred in its instructions to the jury.

3. The court erred in refusing instructions asked by defendants.

4. The court erred in admitting testimony objected to by defendants; and

5. The verdict is against law and evidence.

On the trial the state proved by Harrison Thompson, a youth about twelve years of age and son of Charles Thompson, indicted, but (having severed) not on trial, that Thompson, the father, took witness and another younger son, Charlie, and a wagon and "went out after beef; we went through the woods about one and a quarter miles; when about one hundred yards from the beef, Uncle Tom Ake (also indicted) met us, and showed the way." Taking boys precludes the idea of intent. When they reached the beef, Uncle Dan and Lige (meaning the other defendants) were skinning the beef. It was partly skinned. Soon after Tom took the axe and commenced cutting on the brisket. After about a quarter of an hour Mr. Dobbs and Dennis came near, and Dobbs hallooed and asked "What are you doing?" Tom Ake answered, "We are killing a beef," and then the dogs commenced fighting. Tom Ake, Lige Oates, and Dave Williams were at the beef. Papa (meaning defendant, Thompson) was standing near the fire. The fire was some twenty-five or thirty feet from the beef. I and Charlie ran off and hid in the bushes. Soon heard licks and a groan. After a while papa came with the wagon, and as we got in papa said we must tell nothing about it: it would give him trouble. The axe (which was here shown to witness) is papa's axe, and the axe Tom Ake had cutting the beef. The axe when Dobbs

came up was standing by a cedar stump near the fire. The moon was going down when we left the scene of the killing. Papa drove the wagon until near the creek and left us, telling us to take the wagon across the creek and leave it near the lime-kiln. We locked the wagon going down the hill at the creek. Papa went back from the creek to the wagon and drove it up to near Mr. Harts', and witness turned out the oxen. We then dragged the wagon home, papa at the [tongue?] and witness at the wagon.

Upon cross-examination witness stated that he heard twenty-five or thirty licks struck. Thompson was at the fire when last seen by witness. It was about dusk when they started out with the wagon after the beef. Witness recognizes the axe (in court) as belonging to his father and the one taken on the evening they went out for beef. Also recognized a narrow plank as belonging to the wagon and lost on that evening.

Charles Thompson's testimony was substantially the same, with the addition that " when the dogs began fighting (we had three, and Dobbs brought dogs) Tom Ake and all the others started to where Mr. Dobbs was."

It was in proof, by C. W. Lewis, a medical expert, that deceased came to his death by means of an axe or similar instrument.

J. J. Demmett testifies that on the morning after the killing he and others went out to where the murder should have occurred. They there found the bodies of Dobbs and Dennis. Near by found a plank and beef partly skinned. Within twenty-five feet of the beef a fire had been built. They soon discovered a wagon trail, which following, they found the wagon at the house of Thompson, one of the alleged murderers. By means of the plank picked up at the scene of the tragedy, the width of the tire, locked wheel upon descending the hill, and the wabbling motion of another, it seems that the wagon was fully

identified as the wagon driven by Thompson on the evening of the homicide.

It seems that although not distinctly stated, the party in company with Demmett took Thompson into custody, and through him found the axe identified as his, and the one used in cutting the beef.

And here the fact is singly stated, without connection with any other matter, that Charley Thompson admitted to me (Demmett,) that he and defendants on trial killed Dobbs and Dennis.

Other witnesses on the part of the state testified to circumstances tending to establish the fact, that defendants on trial and Thompson were present when the homicide occurred.

On the part of the defense there were some witnesses whose testimony looked to the establishment of an *alibi*. As to the main facts they knew nothing.

Thus, we have a view of the case as presented by the facts deemed necessary to notice in connection with law, as laid down by the court in instructions to the jury.

1. Murder is the unlawful taking of the life of a reasonable creature in being within this state, with malice aforethought, either express or implied.

2. Murder is distinguishable from every other species of homicide by the absence of the circumstances which reduce the offense to negligent homicide or manslaughter, or which excuses or justifies the homicide.

3. All murder committed with express malice, that is, with deliberate, fixed purpose, is murder of the first degree.

4. You are the exclusive judges of the weight of testimony, and it is your province and your duty, if you can, to reconcile the apparent contradictions and discrepances between witnesses, and from their manner of testifying and all surrounding circumstances to give to each witness and

their statement such credence as you believe them entitled to.

5. If you believe from the evidence that the parties charged, the defendants on trial and Charley Thompson, were present at and participated in the killing of Dobbs, the admissions and statements of Charley are evidence against them on trial, and you will attach weight to them as in your opinion they are entitled to.

6. If under all the evidence before you, which it is your duty to maturely and dispassionately consider, giving to the defendants the benefit of all well-founded reasonable doubts, you are of opinion that the defendants are guilty, as charged, of murder in the first degree, you will say so by your verdict; and if you do not believe them guilty, you will acquit them.

Defendants' counsel asked the court to instruct the jury, that "The confessions of one defendant is not evidence against any one save the prisoner who made it;" which was refused.

The instruction asked by the defendant evidently was intended to exclude from the consideration of the jury the confession of Thompson, (not on trial,) made to witness Demmett, to wit, "Charlie Thompson admitted to me that he and the defendants on trial killed Dobbs and Dennis."

Upon what ground the court permitted this to go to the jury we are at a loss to determine.   If upon the hypothesis that a conspiracy existed between the parties to take the life of the deceased, or to commit any other unlawful act, still it was wholly inadmissible, unless such a conspiracy had been established by competent proof, other than the naked admissions of the accused.   (10 Peck, Mass., 497; 2 Stark. on Ev., 401–403, and notes; Phillips on Ev., 414; Draper v. State, 22 Tex., 404.)

If under the statute, then the foundation for the introduction of confessions had not been laid, by showing that the confessions had been made under such circumstances

as to authorize their admissibility. (Paschal's Dig., Arts. 3126, 3127, and Notes 760 and 761.)

For this error alone the cause should be reversed. But, inasmuch as a new trial must be had, we will proceed to lay down the law of murder in the first degree under our statute, and see how far the evidence in this case tends to establish that crime; for we understand the law to be, that the defendants have the right to an impartial trial under all the laws applicable to the facts of their case; and if the court should fail to cover the whole ground, or defendants' counsel neglect to ask for fuller instructions, this court, upon a review of the whole case, will not hesitate to set aside a verdict not sustained by the evidence. This rule, however, is applicable to felony cases—not civil.

. Under our statute murder is of two degrees.

All murder committed by poison, starving, torture, or with express malice, or committed in the perpetration, or in the attempt at the perpetration, of arson, rape, robbery, or burglary, is murder of the first degree; and all murder not of the first degree is murder of the second degree. (Article 608, Penal Code; Paschal's Dig., Art. 2267, Note 672.)

It will be observed that in the definition of murder of the first degree our statute excludes implied malice as an element. When malice implied only is ascertained to exist, the offense is reduced to murder of the second degree; and as the facts of this case show that neither of the fixed statutory *indicia* existed, unless it be that of express malice, we must determine from the evidence whether the killing was with express or implied malice. If malice express is found, it will be murder of the first degree; if implied, murder in the second degree.

At common law, all murder, whether by express or implied malice, was punished capitally; but the humane tendency of modern legislation is to reduce the number of capital offenses, and hence the distinction drawn by ours

and other American statutes between murder of the first and second degree.

To trace this admitted distinction, to draw an unerring line, pointing with undeviating certainty to the grade of an offense upon a state of facts thereafter to arise, has hitherto baffled the skill and taxed, without success, the legal acumen of our most eminent jurists.

The nearest approach we can make is to lay down certain fixed rules, founded in principle, and apply them to each case as it may arise.

In his exhaustive opinion, Judge ROBERTS, in the case of McCoy v. The State, 25 Tex., 33, after having explored every source of information within reach, adopted, as the most accurate definition of express malice, that

"When one, with a sedate, deliberate mind and formed design, doth kill another, which formed design is evidenced by external circumstances discovering that inward intention, as laying in wait, antecedent menaces, former grudges, and concerted schemes to do him some bodily harm." (4 Blacks. Com., 199.)

Sedate is derived from sedo, sedatus, sedare—a Latin verb, which signifies to allay, to calm. Sedate means settled, composed, calm, quiet, still, serene, unruffled by passion, undisturbed, contemplative, sober, serious. (Webster's Dictionary.)

A true analysis of this definition is important to its correct application to any given state of facts.

1. A sedate mind—that is, an unruffled mind, undisturbed by passion—that is, at repose, tranquil, and serene, and in this condition of the mind this formed design must originate. 2. Formed design: This must flow from and be the conclusion arrived at by an exercise of the reasoning faculties. (Dale v. The State, 10 Yerg.; Wright's O., 421; McCoy v. The State, 25 Tex., 33, and authorities there cited.) Hence it follows, that the act must be preceded by deliberation of the mind upon its deadly purpose. (8 Leigh, 745.)

At common law, when the fact of killing is established, the presumption of law is, that it is done upon malice aforethought, until the contrary appears; therefore, the circumstances relied on to extenuate, excuse, or justify, if they do not arise out of the evidence of the prosecution, must be introduced and proved on behalf of the accused, or it is murder. And so, under our statute, we think this rule should be carried no further than to raise, from the fact of killing, the presumption of murder in the second degree, if there be no explanatory circumstances introduced by the state or the prisoner. (Wright's O., 28.)

Such legal presumption ought not to be held sufficient to take away life. To establish express malice, some affirmative evidence should be introduced by the state; but the evidence as to this, as well as all the other ingredients of crime, may be either positive or circumstantial. Whichsoever kind resorted to, however, should be of a nature to convince the understanding beyond a reasonable doubt. (5 Yerg., 341.)

Do the external facts and circumstances of the case at bar disclose sedate minds and formed designs antecedent to the killing, if but for a moment? Do we discover any concerted schemes, former menaces, or grudges? If not, malice express is wanting, and a conviction for murder of the first degree cannot be sustained.

For aught that the record discloses, the defendants, on the fatal evening, were engaged in a lawful undertaking; nor was there an effort on the part of the prosecution to establish the contrary.

The defendant, Thompson, took with him two of his little sons and a wagon, and he knew not at what point the beef was to be found, and was led to the place by another of the defendants in search of him. The beef had been slaughtered in the woods, where it is very improbable they could have expected to meet any one. Whilst thus quietly engaged in dressing the slaughtered animal, the deceased

suddenly appears, and asks, "What are you doing here?" The prompt response is, "We are killing a beef." Then the dogs "began fighting," and all of them ran "up to where Mr. Dobbs was." The witness saw no more. The rest is to be made out from presumptions.

Do these external circumstances satisfy the mind that the defendants acted upon a formed design, resulting from sedate, deliberate minds? We think not; and therefore, express malice not being found, the judgment must be reversed, and remanded for a new trial.

REVERSED AND REMANDED.