## THOMAS AKE (FREEDMAN) v. THE STATE.

See the evidence for a case where the proof was held to be wholly insufficient
  to convict the accused, who was present, of any participation in the homi-
  cide.
Where there was no evidence from which a conspiracy might be inferred, and
  the facts tended to prove that the homicide was the result of a sudden con-
  flict, murder is not proved.
The confessions of a co-defendant, given under torture, that he aided the killing,
  and his subsequent plea of guilty of murder in the second degree, prove
  nothing against those who do not confess.

APPEAL from Travis. The case was tried before Hon.
J. J. THORNTON, one of the district judges.

The facts proved were not unlike those upon the first
trial. (30 Tex., 466.) They are sufficiently set forth in the
opinion of the court.

*M. H. Bowers* and *David Sheeks*, for appellant, argued
the case upon the several errors assigned and upon the
facts; but, as the case was reversed purely upon the insuffi-
ciency of the evidence, the *Reporter* deems it unnecessary
to print their full and exhaustive brief.

No brief for the state has been furnished to the *Reporter.*

CALDWELL, J.—The defendant, together with Charles
Thompson and two others, was indicted at the spring term
of the district court of Williamson county for 1867 for the
murder of William Dobbs.

There was a trial and conviction of murder in the first
degree, and an appeal taken to this court. The judgment
was reversed, and cause remanded for a new trial. (Ake
*et al.* v. The State, Austin Term, 1867,) [30 Tex., 466.] At
the spring term of the district court for Williamson county
one of the defendants, to wit, Charles Thompson, pleaded
guilty of murder of the second degree, and his punishment

thereupon was assessed at ninety-nine years in the penitentiary. The defendant, Tom. Ake and Elija Oates, obtained an order changing the venue to the county of Travis, Dave Williams, the remaining defendant, having in the meantime died in prison. At the March term a trial was had before the Hon. J. J. THORNTON and a jury of Travis, which resulted in a conviction for murder of the second degree.

A new trial was awarded as to Elija Oates, and refused as to Tom. Ake, who prosecuted this appeal alone.

Under the view we take of the case, it is wholly unnecessary to notice more than one of the assignments of error, and that is, "The verdict of the jury was manifestly contrary to law and evidence."

Conceding that the evidence of the two Thompson boys, aged respectively eleven and thirteen, was strictly true, (and they are the only witnesses who connect the defendant in any manner with the homicide,) we are of opinion that it is insufficient to sustain the verdict of the jury.

The evidence of the two boys is substantially, that on the evening of the homicide they went out with their father, Charles Thompson, (who, as before stated, pleaded guilty to this murder,) to kill a beef in the vicinity of Georgetown; that when they reached a point some hundred yards from where a beef was subsequently found killed the defendant, Tom. Ake, met and preceded Thompson and his sons to the spot where the beef was. There they found Williams and Oates, and the party proceeded to dress the beef.

In a short time thereafter the deceased came up, in company with a young man named Dennis, and "hallooed" the party, demanding to know, "What are you doing here?" and appellant replied, "Skinning a beef." At this moment the dogs that followed the deceased and those that were with defendant and his co-defendants "began fighting," and the two boys fled to the bushes hard by and saw

xxxi—27

nothing more of what followed. They however heard "licks and groans;" think they heard "thirty licks." After they had remained in the thicket "some time" their father came "along" with the wagon, and they proceeded *en route* homewards. Before reaching home the appellant overtook them, threw something into the wagon, and went off. The next day the bodies of Dobbs and Dennis were found near the carcass of the beef. Both had evidently been killed with an ax. There are no other circumstances from which legal presumptions can be drawn that appellant participated in the killing, or was present aiding and abetting. There are no circumstances from which a conspiracy can be inferred. The meeting was entirely accidental, and the circumstances repel, to some extent, the idea of concert of action or deliberation, from which malice can be inferred. Nor can we trace any probable motive, unless we leave the record, in the appellant to desire the death of Dobbs. These circumstances are as conclusive to establish the guilt of any dozen or forty individuals who might have been casually present. Certainly so, if all had been jointly indicted and thus deprived of each other's testimony.

We lay no stress upon the confession of Thompson, under torture, that he alone committed the deed; but the fact that he, twelve months thereafter, voluntarily pleaded guilty is a circumstance in so doubtful a case which we cannot resist. The fact, too, that the boys were whipped to extort from them their knowledge of the affair, notwithstanding the material facts to which they testify were corroborated by testimony to which there is no objection, will force itself upon the mind, and throw an additional shade of doubt over the whole transaction as it affects the appellant.

We think that a new trial ought to have been granted, for which error the judgment is reversed and a new trial awarded.

Ordinarily we would here conclude, but in the record

before us there are some disclosures which we cannot pass without notice.

When this case was here at the last term we noticed the cruelty practiced on one of the prisoners and some of the witnesses, and were strongly tempted to comment in terms of just and merited severity on conduct so alien to the feelings of our people and so contrary to the letter and spirit of our laws. We refrained for obvious reasons; but in the record before us there is fuller and amplified statements of these monstrosities. Continued silence on the part of this bench would be winking at the enormity. We owe it to ourselves as men, to the purity of the administration of criminal justice, to the enlightened age in which we live, and to the religion which our citizens profess, to mark in pointed and emphatic phrase our utter detestation of this fiendish outrage. After the arrest of Thompson, his captors hung him up by the neck three or more times, nearly to the point of suffocation, to extort from him a confession of the deed. Failing in this, they staked him out on the ground, piled brush on him, and set fire to it. They thus burned him until the skin peeled off his feet, when, in the agony of his soul, he cried out, "I did it."

These individuals would doubtless consider it an affront to be characterized as other than amongst the "most respectable" and "law-abiding" citizens. We cannot so regard them. In the name of law they violated all law, and renewed a custom which even our native savage tribes have abandoned. The crime of which their wretched and ignorant victim was accused in a Christian land pales before the enormity of their own. When we read of the daring buccaneer, who has thrown off the restraints of civilized life, and under his bloody flag wars on all humanity; or the lawless desperado, who has graduated in every species of crime, developing some new feature of wickedness; or the refined and cultivated knave, who has discovered a yet keener method to "carve out evil," we are pained, we are

shocked, and grieve over the depravity of the human heart. But when we have the evidence before our eyes that in a Christian community this horrible outrage is tolerated, we almost despair, and feel inclined to invoke the aid of the ministers of our holy religion, that they may "perform a lustration" and purify the country from this abominable and detestable villainy.

REVERSED AND REMANDED.