**MODESETT et al. v. EMMONS et ux.[*]
(No. 3212.)**

(Court of Civil Appeals of Texas. Texarkana. June 7, 1926. Rehearing Denied June 24, 1926.)

**1. Assault and battery ⬅︎24(1)—Self-defense relied on in civil action must be specially pleaded and proved by defendant.**

In civil action, self-defense relied on to justify assault must be specially pleaded and proved by defendant, being in legal effect a plea of confession and avoidance.

**2. Pleading ⬅︎374.**

Matter which defendant must specially plead must be proved by him.

3. **Trial ⟨⟩215—Refusal of instruction that actual danger was unnecessary to justify shooting held not error, where special issue whether necessity reasonably appeared to defendant was submitted.**

Refusal of instruction, in action for assault, that actual danger was unnecessary to justify shooting, if defendant acted on reasonable apprehension of danger as it appeared to him, was not error, where court submitted special issue whether it reasonably appeared to defendant that it was necessary to shoot.

4. **Trial ⟨⟩252(6)—Instruction that writ of sequestration was lawfully issued held not required in action for unauthorized arrest, detention, and assault in executing it when such fact was assumed.**

In action for unauthorized arrest and detention of plaintiff and wounding of his wife in executing writ of sequestration, instruction that writ was lawfully issued was not required; such fact being assumed in submitting issues and passing on question of liability.

5. **Sheriffs and constables ⟨⟩157(3)—Shooting of woman attempting to prevent deputy sheriff fom entering house to execute writ of sequestration was done in official capacity within sheriff's bond.**

Shooting of woman by deputy sheriff because of movements evidently intended to prevent him from entering house to execute writ of sequestration was done in official capacity within sheriff's bond, though her acts did not justify so violent an assault.

6. **Judgment ⟨⟩584—Sureties on sheriff's bond need not be held liable for unlawful arrest to sustain judgment for amount thereof, where judgment for injuries to wife of person arrested absorbs more than such amount.**

Sureties on sheriff's bond need not be held liable for unlawful arrest to sustain judgment against them for amount of bond in action for unlawful arrest and injuries to wife of man arrested, where judgment for wife absorbs more than such amount.

7. **Trial ⟨⟩351(5)—Submission of issue whether person suing out writ of sequestration was present when person suing for unauthorized arrest and detention in executing it was handcuffed was unnecessary, where issues as to knowledge and acquiescence therein were submitted.**

In action for unauthorized arrest and detention in executing writ of sequestration, where court submitted special issues whether plaintiff was handcuffed with knowledge or acquiescence of person suing out writ, submission of issue whether such person was present at time was unnecessary.

8. **Assault and battery ⟨⟩18—False imprisonment ⟨⟩15(2).**

Mere presence of person suing out writ of sequestration and failure to protest did not make him participant in unlawful arrest and assault by officer executing writ.

9. **Sheriffs and constables ⟨⟩98(1)—Officer is trespasser in serving process only in case of such departure from line of official duty as to warrant conclusion that it was intended from first.**

For officer to be trespasser in serving process, there must be such departure from line of official duty, such active, willful wrong, as to warrant conclusion that it was intended from first, and that process was used only as cloak for illegal conduct.

10. **Assault and battery ⟨⟩10—False imprisonment ⟨⟩7(3)—Officer and landowner held not trespassers ab initio because of unlawful arrest and assault by officer executing writ of sequestration.**

Landowner and deputy sheriff *held* not trespassers ab initio because of unlawful arrest and detention of squatter and shooting of his wife by officer in executing writ of sequestration, in absence of evidence that they went to squatter's house for purpose of committing unlawful act or that writ was sued out maliciously or for unlawful purpose.

11. **Assault and battery ⟨⟩18—Officer's purpose to commit unlawful act in serving writ of sequestration cannot be imputed to landowner accompanying him without overtly participating in or encouraging act.**

Evil purpose of deputy sheriff to do violence or commit unlawful act in serving writ of sequestration on squatter cannot be imputed to landowner accompanying him without overtly participating in, or encouraging, act; mere intellectual assent or unexpressed sympathy being insufficient.

12. **Appeal and error ⟨⟩930(1).**

On appeal from judgment for plaintiff, his testimony must be taken as true.

13. **False imprisonment ⟨⟩31—Evidence held to show landowner participated in detention of plaintiff handcuffed by officer executing writ of sequestration, and hence was liable for false arrest.**

In action for unlawful arrest and detention of squatter in serving writ of sequestration, plaintiff's testimony *held* to show that landowner accompanying deputy sheriff took active part in detention of plaintiff after he was handcuffed by officer, and hence was liable for false arrest.

### On Motion for Rehearing.

14. **Appeal and error ⟨⟩1173(1)—In absence of evidence of landowner's active participation in, or encouragement of, assault by deputy sheriff in executing writ of sequestration, judgment for damages will be reversed and case remanded for new trial as to him.**

In absence of evidence that landowner accompanying deputy sheriff actively participated in, or encouraged, shooting of squatter's wife in executing writ of sequestration, judgment against him for damages will be reversed and case remanded for new trial as to him.

Appeal from District Court, Harris County; Chas. E. Ashe, Judge.

⟨⟩For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Action by Ike Emmons and wife against H. T. Modesett and others. Judgment for plaintiffs, and defendants appeal. Affirmed in part and reversed and remanded in part on rehearing.

Cole, Cole & O'Connor, W. A. Shields, Campbell, Myer, Simmons & Hawkins, and Stevens & Stevens, all of Houston, for appellants.

A. F. Sundermeyer and Ewing Werlein, both of Houston, for appellees.

HODGES, J. This appeal is from a judgment for damages against the appellants for the unauthorized arrest and detention of Ike Emmons and the wounding of his wife. The following are, in substance, the material facts:

In 1921 the appellant Modesett was the owner of a large tract of unimproved land situated in San Jacinto county. A number of squatters had settled on that land, among them the appellee Ike Emmons and his family. Emmons had gone upon the land early in the year, and had erected a small house which he and his family were occupying at the time the assault complained of was committed. In December, 1921, Modesett filed a suit against all of the squatters occupying the land, including Emmons, for the recovery of title and possession. Upon his affidavit and bond a writ of sequestration was issued simultaneously with the issuance of the citation. On or about the 23d of December of that year, Turner Ross, the sheriff of San Jacinto county, called upon Emmons at the latter's place of residence, delivered to him a copy of the citation, and at the same time notified Emmons that a writ of sequestration had been issued and that he must either replevy the land or move off. He gave Emmons five days in which to execute the bond or move. Emmons admitted that he had no legal claim to the land, and expressed a willingness to move if the proceedings against him were legal. However, he remained upon the land till about December 31, apparently without making any legal investigation or any effort to move. On that date Ross delivered the writ of sequestration to his deputy, Ruge Elmore, one of the appellants, with instructions to execute it. Elmore, accompanied by two other deputies, Diamond and Smith, and Modesett, the owner of the land, went to the house occupied by Emmons and family for that purpose. They took with them two wagons to be used, they stated, in moving the household goods of Emmons. It appears that the residence of Emmons was some distance from the public highway and could be reached only by means of a dim road through a forest. The deputies and Modesett carried guns; Modesett being armed with some kind of a rifle, and the others with shotguns. When they reached the house, Emmons was sitting on his front gallery, his wife was in a chair in the doorway, and her mother was standing somewhere between her and Emmons. The testimony is conflicting as to the details of what then occurred. Emmons testified as follows:

"They (referring to the deputies and Modesett) came up to the house and told me they had come to move me; Ruge Elmore told me he had come to move me, and I told him if he had bonds sufficient to pay the costs of moving my stuff and damages it was all right with me, and Ed Diamond spoke up and said they had it. They did not offer to show me any paper to take possession of the place. The only paper they showed me was on the 22d of December. When they first come up they told me they had come to move me, and I told them if they had bonds sufficient to pay for moving the stuff out on the big road and the damages, and they said they had it, and Ruge Elmore said, 'Come on, boys, let's get them,' and they started in the house. When they come up they had their guns in this position (indicating) like they were slipping up on a bunch of ducks, in this position, just this way, pointed direct toward us, like this, one hand on the stocks of the guns, holding it around the stock this way, and the other where you always hold your hand to shoot a gun. After I told them what I did, my wife told them she didn't want her things throwed out of doors. My wife was setting in the door, kinder in the door, and she said she didn't want her things moved, and she got up out of her chair, and turned around in the chair and caught hold of an old shotgun that was there, and I seen her catch hold of that gun and pull it over to her, like this, and Ed Diamond said, 'Look out for that gun,' and Ruge Elmore pulled down to shoot her, and I said, 'That gun ain't loaded,' and my mother-in-law said, 'That gun ain't loaded,' and he shot, and just as quick as he shot her he said, 'I will kill you; you are to blame for all of this, put your hands up;' and I said, 'Don't shoot me; I ain't to blame;' and my mother-in-law started in the house to see about my wife, and he told her to come out of there, and if she went airy nother step he would blow her heart out; and he went in the house and I heard him tell her to get out of there or he would shoot her again; and she says, 'Please don't shoot me any more; I will get out; and he come out in the place where I was and he drawed the gun on me again, and he said, 'I will kill you, damn you; if it hadn't been for you there wouldn't have been nothing to this; you are to blame about all of it.' * * * When Ruge Elmore started to the house he said, 'Come on, boys, let's get them;' I guess he had reference to the things. My wife did not pick up this gun; I seen her; she was holding it with her left hand. When I stated that the gun was not loaded, I stated it loud enough for them to hear it. My mother-in-law could hear it on the gallery, and these men were closer than she was, and they must have heard it. * * * At the time Ruge Elmore shot my wife he was standing right at the edge of the gallery. The gallery was eight foot wide. * * * They were standing around there in three or four feet of one another, Ed Diamond on one side, kinder to Ruge Elmore's back, and Modesett over on the other side. I was not armed, and did not make any effort to resist the officers, and did not make any threats.

of any kind to them. If my wife made any threats, I did not hear her. After the shooting, the officers and Modesett took us to Shepherd, but before they took us they handcuffed me. They did not show me any warrant of arrest at the time they put the handcuffs on me; they did not show any papers of any kind; they never showed me nothing. At that time, I was not offering any resistance to them, nor making any threats, and was not using any abusive language. Neither was my wife making any. threats or using any abusive language, and she did not offer to resist the officers. * * * They taken us in a wagon part of the way and then put us in a car. * * * We got out of the car (at Shepherd), and I was still hand-cuffed at that time, and lots of people there in town saw me in that condition. I felt awful bad about it; I don't know how I did feel; I felt all in, down and out. I was humiliated by the fact that the handcuffs were on me and people passing by seeing me in that condition, humiliated and worried by that. Then they turned me loose, John Kelly there at Shepherd made a key to unlock the handcuffs, and on my left arm it was swelled so I just could see half of the band that went around my arm. At the time they took the handcuffs off of me my conduct was not any different from the time they put the handcuffs on me. They kept my wife in Dr. McIver's office that night, and on the next day, the 31st, she came to Houston."

The shot inflicted a serious wound on the right arm of Mrs. Emmons, which bled profusely at the time. Modesett and Elmore undertook to stop the flow of blood by binding the arm with a towel. It was then decided to carry Emmons and his wife to Shepherd in order that Mrs. Emmons might have proper medical attention. Immediately after the shooting, Diamond put the handcuffs on Emmons, and kept them on till after their arrival at Shepherd, a distance of about twelve miles from where Emmons lived.

Elmore testified that he shot Mrs. Emmons because he thought she intended to shoot him; that she raised the gun to a position that indicated such a purpose, and his shooting was solely to defend himself. He admitted putting the handcuffs on Emmons, and gave as a reason that he had to send Emmons and his wife in a wagon to Shepherd driven by Smith alone, and he was afraid of some violence to Smith.

It also appears from the uncontradicted testimony that soon after the shooting Modesett left and went to his farm a few miles distant for the purpose of procuring a car. He met the wagon where the road from the bottom intersected the public highway. While Emmons testified that the handcuffs were put on him before Modesett left, Modesett testified that he knew nothing of Emmons having been handcuffed until he met the party at the public road. After arriving at Shepherd, Mrs. Emmons was given the necessary medical attention, and the handcuffs were removed from Emmons. The next morning $84 was given to Emmons by Elmore to en-

able Emmons to carry his wife to Houston for further medical treatment. She remained at Houston under treatment at a hospital for some time, and then discharged with a crippled arm which was pronounced incurable. The evidence shows that a part of the bone had been carried away by the shot, and the use of the arm had been permanently impaired.

This suit was later filed by Emmons and his wife against Modesett, Turner Ross, the sheriff, and his bondsmen, and Ruge Elmore, who did the shooting. The damages sought were for the physical injuries inflicted upon Mrs. Emmons by the shooting, and the illegal arrest of Emmons. The appellants pleaded self-defense as justifying the shooting, and a reasonable apprehension of danger as justifying putting handcuffs on Emmons. The bondsmen of Turner Ross pleaded that they were not liable because the unlawful conduct did not occur in the performance of any official act for which they could be held as sureties on the bond of Ross, the sheriff.

As a basis of liability, the court submitted the following special issues: (1) Were the handcuffs placed upon Ike Emmons with the knowledge of H. T. Modesett? (2) Were the handcuffs placed upon Ike Emmons with the acquiescence of H. T. Modesett? Both of those questions were answered in the affirmative.

The issue of self-defense was submitted in the following form:

"From his situation, did it reasonably appear to the defendant Ruge Elmore at the time he shot the plaintiff Mrs. Emmons that it was necessary to do so to save his own life or to prevent the infliction upon him of serious bodily harm?"

This the jury answered in the negative. In response to other interrogatories the jury assessed the damages of Mrs. Emmons at $13,500, the actual damages to Emmons resulting from the unlawful arrest at $250, and exemplary damages at $250, making a total. of $14,000. In entering judgment, however, the court limited the recovery against the sureties of Ross to $5,000; that being the amount specified in the official bond. All of the parties defendant below have filed briefs in which a number of assignments are presented, but we feel that only a few of them need be discussed.

[1, 2] As a part of his instruction, the court told the jury that the burden of proving self-defense was upon the defendants below, and that instruction is assigned as error. It is contended that it devolved upon the appellees, as plaintiffs, to prove an unlawful assault, and negativing self-defense was an essential part of their burden. The proposition is untenable. In a civil action self-defense, when relied on to justify an assault, must be specially pleaded. It is, in legal ef-

fect, a plea of confession and avoidance. Hardin v. Hodges, 33 Tex. Civ. App. 155, 76 S. W. 217; 2 R. C. L. 577, and cases referred to in notes. Matter which a defendant must specially plead must also be proved by the pleader. Johnson v. Daily, 136 Mo. App. 534, 118 S. W. 530; Ake v. State, 30 Tex. 469; Sumner v. Kinney (Tex. Civ. App.) 136 S. W. 1192. See, also, notes to Welch v. Creech, L. R. A. 1918A, 359.

[3] Appellants also insist that in the interrogatory submitting the question of self-defense the jury were not instructed fully as to the rights of the defendant Elmore under the circumstances confronting him at the time of the shooting. They asked this further instruction:

"In connection with the special issue as to whether it reasonably appeared to the defendant Ruge Elmore, and viewed from his standpoint, at the time he shot Mrs. Emmons, that it was necessary to do so to save his own life or to prevent the infliction upon him of serious bodily harm, you are instructed that, in order for the defendant Ruge Elmore to justify himself in said shooting, it was not necessary that there should have been actual danger, provided that said Elmore acted upon a reasonable apprehension of danger as it appeared to him from his standpoint at the time."

Had the court submitted the issue of liability in a general charge, or so shaped the interrogatory as to require the jury to determine whether or not the shooting was wrongful, an explanation similar to that embraced in the requested instruction would have been appropriate and should have been given when requested. But in this instance the jury was called upon to say whether or not it reasonably "appeared" to Elmore that it was necessary for him to shoot. The language used excluded the idea that the danger must be actual in order to furnish a legal justification. There was no error in refusing the requested instruction.

[4] Nor do we think there was any occasion for the court to tell the jury that the writ of sequestration had been lawfully issued. That fact was assumed in submitting all the issues and in passing upon the question of liability.

[5, 6] The appellants Finger, Lilly, and James, sureties on the bond of Ross, the sheriff, insist that under the evidence no judgment should have been rendered against them, because in shooting Mrs. Emmons and handcuffing her husband the deputy was not acting in an official capacity. These appellants had joined the other defendants below in an answer which specially pleaded that Elmore did the shooting in defense of himself and others while attempting the lawful execution of the writ. The demonstration of Mrs. Emmons which provoked the shot, they say, was an act of resistance to the discharge of a legal duty. If these averments be true, and they are sustained by the evidence, then the shooting was done in the performance of an official act. The proof shows that immediately prior to the shooting Elmore started to enter the house for the purpose of removing the household goods. The movements of Mrs. Emmons were evidently intended to prevent him from entering. However insufficient these may have been to justify so violent an assault, they did cause the assault. It may be true that the sureties should not be held liable for the arrest of Emmons, because this was done without any legal process; but it is not necessary, in order to sustain the judgment for $5,000, that the sureties be held liable for that offense. The judgment in favor of Mrs. Emmons absorbs more than the amount of the bond.

[7] It is contended that the evidence does not warrant a personal judgment against Modesett, either for the assault on Mrs. Emmons or for the unlawful detention of Emmons. The jury found that the handcuffs were placed on Emmons with the knowledge and acquiescence of Modesett. That conclusion implies a further finding that Modesett was present when the handcuffing was done. There was therefore no occasion for the court to ask the jury to say whether or not Modesett was present, as was requested by the appellants.

[8] Seemingly the court based his judgment against Modesett upon the conclusion that his mere presence and unexpressed assent was sufficient to make him legally responsible for all of Elmore's unlawful conduct. If going to the home of Emmons was for the purpose of executing some unlawful scheme, or to commit some unlawful act against Emmons or his family, Modesett's mere presence would be sufficient to show participation in the wrongs committed by his confederate. But the evidence fails to disclose any such unlawful enterprise or purpose. Elmore not only had the right to go there, but it was his legal duty to do so. He also had the right to take with him such assistance as might be needed to enable him to execute the writ by removing Emmons, his family and household goods from the premises. It is too plain for argument that the wounding of Mrs. Emmons was provoked by her demonstration with the gun. While this act might not have been sufficient to justify the shooting, Elmore alone is responsible for treating it as sufficient. The shot was fired so quickly that Modesett's failure to protest should not be construed as a form of encouragement legally sufficient to make him a particeps criminis.

[9-11] Counsel for the appellees defend the judgment against Modesett upon the proposition that Elmore and Modesett, by reason of the unlawful conduct which occurred after their arrival at the Emmons place, became trespassers ab initio. A number of cases are referred to which hold that a valid writ furnishes no justification for the abuse of offi-

cial authority or the perpetration of a legal wrong against the defendant in the writ. But none of them has gone so far as to cover conditions developed by the evidence in this case, and upon which Modesett's liability must depend. The rule which treats an officer as a trespasser does not extend to every irregularity of process. There must be such a departure from the line of official duty, such an active willful wrong perpetrated, as will warrant the conclusion that its perpetration was intended from the first, and that the process was used only as a cloak for illegal conduct. Where the acts proved warrant no such conclusion, it would be unjust to deprive the officer of the protection furnished by the writ, as to what he had lawfully done. McClenny v. Inverarity, 80 Kan. 569, 103 P. 82, 24 L. R. A. (N. S.) 301; 1 R. C. L. 110, and cases referred to in notes. As before stated, the testimony in this case does not warrant the inference that Elmore or Modesett went to the house occupied by Emmons for the purpose of doing any violence, or of committing any unlawful act. Nor is there any evidence that the writ was maliciously sued out, or that it was intended to be otherwise than as legal authority for accomplishing a lawful end. But whatever may have been in Elmore's mind, his evil purpose could not be imputed to Modesett so as to make the latter a trespasser. Murray v. Mace, 41 Neb. 60, 59 N. W. 387, 43 Am. St. Rep. 664. In that case the court said:

"The rule we regard as settled, that one who places in the hands of an officer a valid writ, without directions as to the manner of its service, will not be liable for torts committed by the latter while engaged in the execution thereof; but where he, with knowledge of the facts, advises an abuse of the process of the court, such as a trespass against the person or property of another, he will be regarded as a wrongdoer from the beginning."

It requires some overt participation, or some form of encouragement, in the commission of the offensive act to inculpate one occupying the place of Modesett in this case. His mere intellectual assent, or unexpressed sympathy with the wrongdoer, is not sufficient. Hence we conclude that the judgment against Modesett for the wounding of Mrs. Emmons is not sustained by the evidence.

[12, 13] But his connection with the false imprisonment of Emmons is different. While he may not have encouraged, or aided, in placing the handcuffs on Emmons, Modesett did take some part in the unlawful detention of Emmons thereafter. According to the testimony of Emmons, which must in this appeal be taken as true, when the party arrived at Shepherd, he was held a prisoner till the arrival of Ross, the sheriff. While at Shepherd, and before Ross came, Modesett gave Snyder, the restaurant keeper, a pistol, with directions to take Emmons into another room and give him something to eat. That indicates that Modesett was then taking an active part in the detention of Emmons; and such conduct is, we think, sufficient to make him responsible for the false arrest.

The judgment will be affirmed in whole as to all of the appellants except Modesett. As to him it will be reformed and affirmed for the sum of $500, the amount awarded for the false arrest of Emmons.

### On Motion for Rehearing.

[14] In their motion for a rehearing, the appellees, Emmons and wife, ask that, instead of a judgment acquitting Modesett of any liability for the assault on Mrs. Emmons, the case as to him be reversed and remanded for another trial. We have concluded that this should be done, and the original judgment of this court will therefore be modified accordingly. In all other respects the appellees' motion for a rehearing is denied.